FILED
**United States Court of Appeals
Tenth Circuit**

**February 16, 2024**

**Christopher M. Wolpert
Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JODY RUFINO MARTINEZ, a/k/a Mono,

    Defendant - Appellant.

No. 22-2034

_____

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 1:19-CR-03725-JB-1)**

_____

Nichols T. Hart (Carter B. Harrison IV with him on the briefs), Harrison, Hart & Davis, LLC, Albuquerque, NM, for Defendant-Appellant.

Richard C. Williams, Assistant United States Attorney (Alexander M.M. Uballez, United States Attorney, Albuquerque, New Mexico, with him on the brief), Las Cruces, NM, for Plaintiff-Appellee.

_____

Before **HOLMES**, Chief Judge, **MORITZ**, and **EID**, Circuit Judges.

_____

**HOLMES**, Chief Judge.

_____

A jury convicted Jody Rufino Martinez, a member of the Syndicato de Nuevo

México ("SNM"), a violent New Mexico-based prison gang, of murder under the

Violent Crimes in Aid of Racketeering ("VICAR") Act, 18 U.S.C. § 1959(a),

racketeering conspiracy, and unlawful possession of a firearm.  Mr. Martinez appeals his convictions, arguing that the district court abused its discretion in three principal ways: (1) by denying his motion to dismiss under the Speedy Trial Act, (2) by admitting unduly prejudicial evidence during trial, and (3) by denying his motion for a new trial after evidence emerged that he was involved in threats to kill the presiding district court judge.  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.    BACKGROUND

Mr. Martinez's convictions stem from the 2008 murder of David Romero and the 2018 shooting of Donald Salazar.  To begin, we offer a general overview of the facts established at trial concerning the culture and operations of SNM and those two incidents.  Next, we briefly summarize the procedural history leading to Mr. Martinez's appeal.  We explore in greater detail the factual and procedural background pertinent to Mr. Martinez's appellate challenges in the relevant sections of our analysis.

### A.    Factual Background

#### 1.    SNM

SNM has operated within New Mexico's prison system for decades.  Indeed, the gang's purpose is to "run the prison system," a mission it accomplishes through violent crime and drug distribution, both inside the prison system and "on the streets."  R., Vol. 4, at 892 (Test. of Mario Rodriguez) (Trial Tr., Vol. 3, dated Mar. 3, 2021).  In that regard, violence is central to the gang's life and the activities of gang members.

2

Gang leadership exercises control over the organization by embracing a "[b]lood in, blood out" philosophy, meaning that a prospective member must "spill an enemy's or rival's blood," *id.*—which is called "[e]arning your bones," *id.* at 895—"and [then] there is no getting out until you are dead," *id.* at 892. When a person becomes a member (a "carnal"), he is expected "to perpetuate the violence of the SNM" by assaulting or killing rivals, *id.* at 894, sex offenders, and "snitches," *id.* at 1341 (Test. of Matthew Martinez) (Trial Tr., Vol. 5, dated Mar. 5, 2021). A member's capacity to inflict violence is a critical component of the organization's broader effort to maintain status in New Mexico's criminal underbelly. As one SNM member explained, SNM maintains its primacy "by instilling fear in other people." *Id.* at 2060 (Test. of Billy Cordova) (Trial Tr., Vol. 8, dated Mar. 10, 2021). In SNM's view, that means that "if you move on one of us, we move back on you." *Id.*

In that regard, a "move" on SNM was always perceived as a sign of "disrespect." *Id.* And "respect" in SNM's milieu is "everything"; it is so important that it behooves SNM members to "protect it with [their] li[ves]." *Id.* at 897. Because tolerating disrespect threatens to unravel the fabric of its power—that is, fear—SNM members cannot countenance it in "any way, shape, or fashion, no matter how severe the consequences are"—even if those consequences entail "get[ting] a life sentence." *Id.* at 2060.

But just as "get[ting] a life sentence" to maintain "respect" will get you "a pat on the back" in SNM, *id.*, disobeying orders will get you "green l[it]"—meaning, killed, *id.* at 944 (Test. of Roy Martinez) (Trial Tr., Vol. 3, dated Mar. 3, 2021).

3

With death as the punishment for insubordination, SNM's carnals have "no choice," in their view, but to follow orders—including orders to kill people suspected of cooperating with law enforcement. *Id.* at 923. As one SNM member explained, "[w]hen there is a green light" on the line, SNM members "don't take th[e] chance" of being disobedient. *Id.* at 2052.

### 2.    The FBI's Investigation into SNM

In March 2015, the FBI launched an investigation of SNM after receiving information regarding threats to New Mexico Department of Corrections personnel. The investigation and resulting charges occurred in phases, the last of which was prompted by the 2019 murder of a cooperating witness. The government arrested Mr. Martinez as part of this latter phase of the investigation.

### 3.    The VICAR Charge and the 2008 Murder of David Romero

#### a.    Mr. Romero's Failed Drug Delivery

Though not a member of SNM, David Romero, Mr. Martinez's cousin, agreed to smuggle drugs into New Mexico prison for the gang's consumption. The risks were high: "if someone was asked to smuggle drugs into a jail and failed to follow through" they would be punished with "severe consequence[s]," including "[g]reat bodily harm." *Id.* at 1112 (Test. of Rudy Salazar) (Trial Tr., Vol. 4, dated Mar. 4, 2021).

But, according to Rudy Salazar ("Rudy"), who joined SNM in the summer of 2008, Mr. Martinez had enough confidence in Mr. Romero to entrust him with "a package of drugs" intended for his imprisoned compatriots. *Id.* at 1113. Mr.

4

Romero, however, "burnt" Mr. Martinez by "never turn[ing] himself in to the [authorities], and . . . disappearing" with the goods. *Id.* When word got around, the "carnals" took Mr. Romero's failure to hold up his end of the deal as "disrespect." *Id.* at 1358. In effect, by absconding with the drugs, Mr. Romero broke "one of the codes that you never break": he "cross[ed] the SNM." *Id.* Mr. Martinez responded by calling an Albuquerque-based SNM associate, Billy Cordova ("Billy"), to "hold" Mr. Romero "if . . . he show[ed] up" at a "sugar shack"—*viz.*, a "heroin house"— "because he had burned [SNM]." *Id.* at 2061–62. Billy never had the opportunity to "hold" Mr. Romero, as the latter never appeared in Albuquerque.

### b.    The Murder

In November 2008, Mr. Romero emerged but "was on the run" and told Rudy that he "wanted to turn himself in." *Id.* at 1111. Rudy told Mr. Martinez that Mr. Romero "was looking for help to turn himself in," and, more specifically, "was looking for another package of drugs" to carry as he surrendered to authorities. *Id.* at 1114. Mr. Martinez appeared amenable and personally arranged for Mr. Romero to smuggle additional drugs into the county jail.

But the trial record showed that Mr. Martinez had other plans. Specifically, it showed that Mr. Martinez, along with a group of affiliates, including Rudy, "picked up [Mr. Romero] in front of a project house" and brought him to SNM member Jerome Cordova's ("Jerome") home in Chimayo, New Mexico. *Id.* at 1116–17. Everyone—including Mr. Romero, who struggled with addiction—proceeded to consume drugs. Mr. Martinez, however, confronted Rudy, presenting him with "a

5

foot-and-a-half length of cord"—specifically, cut jumper cable cord—and told him "this is on you." *Id.* at 1120. Rudy understood Mr. Martinez—"who was calling the shots that evening"—to be ordering him "to kill David Romero." *Id.* at 1118, 1120.

Any doubt regarding Mr. Martinez's designs was erased by his subsequent conduct. Using duct tape, Mr. Martinez secured the cut jumper cables to Rudy's hands and followed him to the bedroom where Mr. Romero was "getting high." *Id.* at 1121–22. When Rudy entered the bedroom, he saw that Mr. Romero "had a syringe in one hand and a spoon in the other," and "had just finished" shooting up. *Id.* Upon seeing Rudy, Mr. Romero appeared "shock[ed]," his eyes bulging from cocaine use. *Id.* at 1122. Rudy testified that he hesitated to kill Mr. Romero. But Mr. Martinez "gave [him] a nudge" and ordered "[a]hora," [1]—prompting him to "thr[o]w the cord over [Mr. Romero's] neck," wrapping it around twice. *Id.* at 1123. Mr. Martinez jumped to the head of the bed, placed Mr. Romero's head in a leglock, and "twisted it from side to side, trying to break his neck." *Id.* at 1125–26. Eventually, Mr. Romero stopped moving. After checking for a pulse and finding none, Mr. Martinez confirmed that Mr. Romero was dead.

Mr. Martinez then assisted the group in removing Mr. Romero's clothes and the bed sheets—as they were murder evidence, after all—and placed them "in a . . . big black trash bag." *Id.* at 1128. Members of the group, including Rudy and Jerome, then wrapped Mr. Romero's body in a comforter and loaded it in the back of

---

[1] According to Rudy Salazar's testimony, "[a]hora" means "now." R., Vol. 4, at 1123.

a pickup truck.  Mr. Martinez tasked Rudy with disposing of Mr. Romero's body.  Yet, before Rudy could do so, Mr. Martinez gave him a more pressing assignment:  "Before I jumped into the truck, [Mr. Martinez] grabbed me, pulled me towards him, and poked me in my throat . . . and handed me a knife and said, 'Stab him.  Make sure he's dead.'"  *Id.* at 1129–30.  Rudy did as instructed, and, with Jerome's help, "rolled [Mr. Romero] off [a] bridge."  *Id.* at 1133.  From there, the pair drove to a back road where they set fire to Mr. Romero's clothes and the bedding used to transport his body.  Mr. Martinez greeted them when they returned, shaking their hands, and affectionately telling Rudy, "I'll talk to you later."  *Id.* at 1136.

On Friday, December 5, 2008, Mr. Romero's body was found in a river near Chimayo, New Mexico.  When police discovered Mr. Romero's body, "they flipped [it] over, [and] . . . saw a stab wound . . . to the neck."  *Id.* at 1028 (Test. of Algin Mendez) (Trial Tr., Vol. 4, dated Mar. 4, 2021).  The official cause of death was a stab wound to the neck, although strangulation could not be ruled out.

### c.    The Failed Alibi

New Mexico State Police interviewed Mr. Martinez the day after finding Mr. Romero's body, and again four days later.  Mr. Martinez claimed that he had been with his then-wife, Judith Perez-Martinez, during the relevant timeframe.  Indeed, when the police talked to her, she provided a partial alibi.  At trial, however, Ms. Perez-Martinez testified that Mr. Martinez had not been with her, and that she had lied because she feared Mr. Martinez.

### d.     Mr. Martinez's Admissions

Though Mr. Martinez denied killing Mr. Romero to the police, the government presented evidence showing he was eager to discuss the murder with SNM associates. According to SNM member Jose Lovato, Mr. Martinez took credit for Mr. Romero's murder and bragged that "he slit [Mr. Romero's] throat." *Id.* at 2134 (Test. of Jose Lovato) (Trial Tr., Vol. 8, dated Mar. 10, 2021).  Likewise, Mr. Martinez boasted to Billy Cordova that he "whacked" Mr. Romero, "slit his throat, and dumped him in the river." *Id.* at 2065.

Despite Mr. Martinez's evident pride in killing Mr. Romero, SNM leadership failed to, in his view, adequately compensate him for his "work." *Id.* at 2186 (Test. of Jerry Montoya) (Trial Tr., Vol. 8, dated Mar. 10, 2021).  According to one SNM associate to whom Mr. Martinez complained, Jerry Montoya, Mr. Martinez thought his murder of Mr. Romero entitled him to receive the "keys to the north"—meaning "[b]eing the boss, . . . [and] running the streets" in northern New Mexico. *Id.*  If not that, Mr. Martinez thought, at the very least, he deserved "a bigger tribute" from SNM member Matthew Martinez, who "was on the streets, sending in drugs and money to his friends" in prison. *Id.* at 2187.  In that regard, when lamenting the size of his drug tribute, Mr. Martinez emphasized the nature of the "work" he had "put in" for the organization—"committ[ing] . . . a murder"—by making a strangling motion with his hands. *Id.* at 2187–88.

8

**4.    The RICO Conspiracy, the Felon-in-Possession Charge, and the 2018 Shooting of Mr. Donald Salazar**

In Count 2 of the Superseding Indictment, the government alleged that Mr. Martinez engaged in a RICO conspiracy.  To convict Mr. Martinez on that count, the jury had to find that he joined an agreement to conduct the affairs of an enterprise through a pattern of racketeering activity.  This, in turn, required the jury to agree that at least one member of the conspiracy committed two or more racketeering acts.  The Superseding Indictment alleged several such acts, including the 2018 shooting of Donald Salazar ("Donald"), Rudy Salazar's brother.  Mr. Martinez's shooting of Donald also served as the basis for Count 4, the felon-in-possession charge.  The pertinent facts established at trial concerning this matter are as follows.

**a.    The Dispute Between Donald Salazar and Mr. Martinez**

While imprisoned in the summer of 2018, Mr. Martinez got into a fight with Donald, a member of a rival street gang.  According to Donald, the fight unfolded after Mr. Martinez refused to relay a message to other inmates.  "[H]urt" by Mr. Martinez's rejection, Donald "walked away."  R., Vol. 4, at 1594 (Test. of Donald Salazar) (Trial Tr., Vol. 6, dated Mar. 8, 2021).  As he did so, Mr. Martinez "called [him] a bitch."  *Id.*  Later that day, Donald confronted Mr. Martinez, but Mr. Martinez "thr[e]w the first punch" and hit him with a "jab."  *Id.* at 1596–1597.  A melee ensued and the end results were unfavorable to Mr. Martinez: Donald, to be sure, "had a bloody nose," but Mr. Martinez sported "a black eye" and was beaten "bloody."  *Id.* at 1598.  Even Mr. Martinez knew that he lost.  Recounting what Mr.

9

Martinez told him of the struggle, Mr. Lovato testified that Donald "got the best of" Mr. Martinez. *Id.* at 2132. Under SNM's rules, this was "an act of disrespect." *Id.* And the consequence for "disrespect" is "death." *Id.*

### b.     The Shooting

On October 24, 2018, by happenstance, Mr. Martinez and Donald ended up at the same house to buy drugs. When Mr. Martinez first entered the house, "he was in a good mood." *Id.* at 1603. "But when he s[aw] [Donald], his whole demeanor changed." *Id.* Mr. Martinez confronted Donald, and referring to their prison fight, asked "why [he was] going around talking that [he] fucked [him] up." *Id.* Donald quipped, "Well, I didn't have a black eye or nothing, homes." *Id.* at 1603–04.

Mr. Martinez exited the house, retrieved a gun from his truck, returned, and, though aiming for Donald's genitals, shot him in the leg. After hearing the gunshot, a sixteen-year-old child entered the room; Mr. Martinez told him to "[t]ake [Donald] to the hospital or [he would] shoot [him], too." *Id.* at 1816 (Test. of Joey Rodriguez) (Trial Tr., Vol. 7, dated Mar. 9, 2021). When police arrested and interviewed him over Donald's shooting, Mr. Martinez advised that he was "not a gun-type person, I'm a knife-type person." *Id.* at 1985 (Test. of Sgt. Caroline Brandle) (Trial Tr., Vol. 8, dated Mar. 10, 2021).

### c.     Mr. Martinez's Subsequent Statement

In 2019, while jailed in Santa Fe, Mr. Martinez instructed Jose Lovato to kill

Donald if Mr. Lovato saw him when he was released—and to make sure "that

everybody knew it was for the S."[2]  *Id.* at 2133.

### B.     Procedural History

On October 16, 2019, a one-count indictment charged Mr. Martinez with being

a felon in possession of a firearm and ammunition.  Following Mr. Martinez's initial

indictment, the district court scheduled trial to begin on December 16, 2019.  Eleven

days before the scheduled trial date, on December 5, 2019, the government filed a

complaint charging Mr. Martinez with a racketeering conspiracy in violation of 18

U.S.C. § 1962(d).  On December 11, 2019, the grand jury returned a Superseding

Indictment containing that charge; the Superseding Indictment also realleged the

felon-in-possession charge, renumbered as Count 2.  On January 9, 2020, the grand

jury returned a Second Superseding Indictment, which realleged the felon-in-

---

[2]     The government elicited this testimony from Mr. Lovato.  However, apparently neither during the course of Mr. Lovato's examination nor later in its appellate briefing does the government attempt to clarify the precise import of Mr. Martinez's "for the S" comment.  A reasonable jury likely could have inferred that, according to Mr. Lovato, Mr. Martinez was instructing him to tell everybody that the killing was for SNM to retaliate for Donald's act of disrespect.  And that is the way the government framed this exchange in its closing argument to the jury.  *See* R., Vol. 4, at 2797 (discussing Donald's "act of disrespect" in attacking Mr. Martinez and Mr. Lovato's knowledge that Mr. Martinez "had retaliated for that act of disrespect").

possession and racketeering conspiracy charges and raised VICAR and witness tampering allegations.[3]

After the grand jury returned the Superseding Indictment in December 2019 but before it returned the Second Superseding Indictment in January 2020, the parties attended a pretrial conference. At the conference, Mr. Martinez advised that he intended to move to sever the counts. The government opposed severance and, owing to its anticipated disclosure of approximately 90,000 pages of discovery related to the racketeering charge, said that a continuance might be necessary if a joint trial was to be held.

Both parties filed motions later that day. As it had previously telegraphed, the government moved to continue the December 16 trial, citing the need to disclose the racketeering discovery and the risk that defense counsel would be ineffective without sufficient time to review it. For his part, Mr. Martinez filed a motion to sever based on "an untenable conflict" between waiving "the at-most-70-days Speedy Trial Act protection for the felon-in-possession charge [and] the at-least-30-days Speedy Trial Act protection for the RICO Conspiracy charge," as well as due to the purported inadmissibility of gang-affiliation evidence in the felon-in-possession trial. R., Vol. 1, at 59 (Def.'s Mot. to Sever Offenses, filed Dec. 12, 2019) (hereinafter the "Motion to Sever"). According to Mr. Martinez, these factors created prejudice that necessitated severance under Federal Rule of Criminal Procedure 14. As discussed in

---

[3]    The jury acquitted Mr. Martinez of witness tampering; that charge is not subject to the instant appeal.

greater detail, *infra*, the district court orally denied Mr. Martinez's Motion to Sever and subsequently granted the government's motion to continue.

Later, on January 19, 2021, Mr. Martinez moved to dismiss the felon-in-possession charge on Speedy Trial Act grounds. On January 27, 2021, the district court entered a written memorandum opinion and order explaining its decision to deny Mr. Martinez's Motion to Sever. Then, on February 18, 2021, the district court orally denied Mr. Martinez's motion to dismiss under the Speedy Trial Act.

Finally, Mr. Martinez's trial commenced on March 1, 2021. The jury returned its verdict on March 16, 2021, finding Mr. Martinez guilty of the counts of VICAR, racketeering conspiracy, and felon-in-possession, and acquitting him of the count of witness tampering. Following the jury's verdict, Mr. Martinez filed a sealed motion for new trial in which he argued that testimony allegedly linking Mr. Martinez to threats against the court entitled him to a new trial. The district court denied that motion in a memorandum opinion and order on July 12, 2021.

## II.   STANDARD OF REVIEW

We review each of Mr. Martinez's appellate challenges through the prism of our abuse of discretion standard. *See United States v. Banks*, 761 F.3d 1163, 1174 (10th Cir. 2014) (reviewing the denial of a motion to dismiss for violation of the Speedy Trial Act, involving ends-of-justice continuances, for an abuse of discretion); *United States v. Thompson*, 524 F.3d 1126, 1131 (10th Cir. 2008) (same); *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 384 (2008) (reviewing rulings applying Federal Rule of Evidence 403 for an abuse of discretion); *United States v.*

13

*Gwathney*, 465 F.3d 1133, 1144 (10th Cir. 2006) (reviewing the denial of a motion for a new trial under the abuse of discretion standard). "A court abuses its discretion when it 'renders a judgment that is arbitrary, capricious, whimsical, or manifestly unreasonable.'" *United States v. Perrault*, 995 F.3d 748, 764–65 (10th Cir. 2021) (quoting *United States v. Munoz-Nava*, 524 F.3d 1137, 1146 (10th Cir. 2008)). And "[a] district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990). As such, "we review the district court's compliance with the legal requirements of the [statute or rule under which it made its ruling] de novo and its underlying factual findings for clear error." *Banks*, 761 F.3d at 1174.

We have described the "clear-error standard" as "deferential." *United States v. Nkome*, 987 F.3d 1262, 1276 (10th Cir. 2021). To satisfy it, Mr. Martinez must leave us with a "definite and firm conviction that a mistake has been made." *United States v. Pulliam*, 748 F.3d 967, 970 (10th Cir. 2014) (quoting *Manning v. United States*, 146 F.3d 808, 812 (10th Cir. 1998)). Conversely, "[i]f the 'court's account of the evidence is plausible in light of the record viewed in its entirety,' we may not reverse it even if we might have weighed the evidence differently." *Nkome*, 987 F.3d at 1277 (alteration in original) (quoting *United States v. Piper*, 839 F.3d 1261, 1271 (10th Cir. 2016)). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985).

14

## III.    DISCUSSION

Mr. Martinez argues that the district court judge abused his discretion in three ways: (1) by basing his denial of Mr. Martinez's motion to dismiss under the Speedy Trial Act on a clearly erroneous interpretation of the facts; (2) by admitting unduly prejudicial evidence related to SNM-backed murders when Mr. Martinez conceded in his opening statement that SNM murdered law enforcement cooperators and those it perceived to be threats as part of its criminal enterprise; and (3) by failing to *sua sponte* recuse himself after hearing testimony that purportedly connected Mr. Martinez to violent threats against the district court judge himself.  We offer additional background information regarding each of Mr. Martinez's appellate challenges before discussing the substantive legal frameworks governing his claims.  After fully exploring his arguments, we conclude that the district court did not abuse its discretion.

### A.    The Speedy Trial Act Claim

#### 1.    Factual Background

##### a.    Mr. Martinez's Motion to Sever and the Government's First Motion to Continue

On October 16, 2019, a federal grand jury returned an indictment against Mr. Martinez that alleged he knowingly possessed a firearm and ammunition as a convicted felon.  The district court initially scheduled Mr. Martinez's trial for December 16, 2019.  On December 11, 2019, fifty-six days after the initial indictment's filing, the grand jury returned a Superseding Indictment.  The

15

Superseding Indictment charged Mr. Martinez with one count of racketeering conspiracy and re-alleged the existing felon-in-possession allegation.

The day after the grand jury returned the Superseding Indictment, Mr. Martinez moved to sever the charges in anticipation of the December 25, 2019, Speedy Trial Act deadline for his felon-in-possession charge. In that motion, Mr. Martinez urged that separate trials were necessary to ensure compliance with the Speedy Trial Act. More specifically, Mr. Martinez argued that the Superseding Indictment's addition of the racketeering conspiracy charge created an untenable conflict between two of the Speedy Trial Act's guarantees: on the one hand, the Speedy Trial Act entitled him to a trial on his felon-in-possession charge within seventy days of indictment and, on the other hand, it shielded him from going to trial on the racketeering conspiracy charge with fewer than thirty days to prepare a defense. Accordingly, severance was necessary because the felon-in-possession charge's Speedy Trial clock was scheduled to run on December 25, 2019. Mr. Martinez also emphasized the completion of discovery as to the felon-in-possession charge and his counsel's diligent preparation relating to, and readiness to defend, that charge. Lastly, he argued that he would suffer prejudice if the government was unable to secure its witnesses—many of whom had citations for failing to appear—for a rescheduled trial date. The government, meanwhile, filed an opposed motion to continue a joint trial.

The district court held a two-day pre-trial conference starting on December 12, 2019, the same day that Mr. Martinez moved to sever the charges. Of relevance here,

two issues occupied the district court's attention during the conference: (1) whether the court should sever the felon-in-possession count from the racketeering conspiracy count so that the felon-in-possession count could be tried without violating the Speedy Trial Act; and (2) whether it should grant the government's opposed motion to continue the December 16, 2019, trial date because it needed "to disclose discovery on the racketeering charge to defense counsel that . . . [was] approximately ninety thousand pages." R., Vol. 1, at 54 (Mot. to Continue Trial, filed Dec. 12, 2019) (hereinafter the "First Motion to Continue Trial").

The next day, the court denied Mr. Martinez's Motion to Sever but nevertheless expressed concern "that the felon in possession [charge] might well be subject to a motion to dismiss on Speedy Trial Act grounds." *Id.*, Vol. 4, at 105–06 (Pretrial Conf. Tr., Vol. 2, dated Dec. 13, 2019). Indeed, it expressly noted that "the Government should be forewarned that I may end up dismissing [the felon-in-possession charge because of the] Speedy Trial Act." *Id.* at 115. In that vein, following its decision to deny the Motion to Sever, the court asked the government if it still wished to proceed with a joint trial; in so doing, the court noted that it was "aiming toward dismissing . . . the felon in possession [charge] for lack of speedy trial." *Id.* The government decided to continue forward with a joint trial.

The district court then asked for Mr. Martinez's position regarding the government's First Motion to Continue. Mr. Martinez responded:

> [T]o clarify our position on the Government's motion to continue,
> I thought that we made it pretty exceptionally clear that our first

preference is to try a severed felon-in-possession case next week. I do think we've been pretty repeatedly clear on that point.

But at the hearing yesterday, . . . the position we were taking . . . was that our second preferred position was to just go ahead and try a joined felon-in-possession/RICO case, and then our third position was to continue the entire trial.

. . . . If we have to try a joined trial, we need a continuance.

*Id.* at 142. In other words, and consistent with his Motion to Sever, Mr. Martinez did not "consent to a continuance of the felon-in-possession trial" but agreed that a thirty-day continuance *was necessary* if he was "forced to have a joint trial"—*viz.*, if the district court denied his Motion to Sever. *Id.* at 144.

### b. The District Court's Order Continuing Trial

Ultimately, on December 13, 2019, in an oral order, the court granted the government's First Motion to Continue over Mr. Martinez's objection. It found that "granting a continuance [would] strike a proper balance between the ends of justice and the best interests of the public and of the Defendant," and noted that Mr. Martinez "represented" needing at minimum thirty days to prepare for trial if his case was tried on both counts. *Id.*, Vol. 1, at 71 (Order, filed Dec. 13, 2019) (hereinafter the "Oral Order Continuing Trial"). In that regard, the district court concluded that "continuing disclosure of discovery[] outweigh[ed] the Defendant's and the public's interest in a speedy trial." *Id.*

### c. The Court Declares the Case Complex

On January 9, 2020, the grand jury returned the Second Superseding Indictment. The Second Superseding Indictment included the VICAR charge

stemming from Mr. Martinez's alleged participation in the murder of David Romero, as well as a charge of witness tampering stemming from a threat to a government cooperator. On the parties' joint motion, the district court declared the case complex because the VICAR charge was death eligible—which necessitated appointment of learned counsel and a mitigation investigation—and also vacated the trial setting. In declaring the case complex, the district court excluded "all of the time from the filing of the Motion to Declare the Case Complex until the beginning of the jury trial . . . for the purposes of the Speedy Trial Act, and [noted that] the ends of justice in granting the [government's first motion to continue] outweigh the best interests of the public and the defendant in a speedy trial." *Id.* at 139 (Mem. Op. & Order, dated Jan. 27, 2021).

  **d.**  **The Government's Second Motion to Continue**

  On January 10, 2020, the government filed a second motion to continue. *See United States v. Martinez*, Crim. No. 19-3725 JB, ECF No. 59 (Second Mot. to Continue Trial, filed Jan. 10, 2020). That motion stated that "[d]efense counsel for the Defendant does not oppose this motion," but noted for preservation purposes, that "[t]he Defendant clarifies that he consents to a continuance of the VICAR, RICO conspiracy, and witness tampering charges," and that "[t]he Defendant continues to maintain his position that the felon-in-possession charge should be severed, so he does not consent to a continuance on that count." *Id.* at *3 & n.1. The district court granted this motion, too.

19

### e. Mr. Martinez's Speedy Trial Act Motion to Dismiss

On January 19, 2021, Mr. Martinez filed a motion to dismiss the felon-in-possession count under the Speedy Trial Act, urging that the Speedy Trial clock for the felon-in-possession charge ran in December of 2019.  Mr. Martinez argued that "while the Government's ability to supersede [an indictment] is nearly unlimited, they do have to be prepared to stay on their pre-assigned timeline if that's what the defense wants, as 'the filing of a superseding indictment does not reset the speedy-trial clock for offenses charged . . . in the original indictment.'"  R., Vol. 1, at 92 (Def.'s Opposed Mot. to Dismiss Count 4 of the Indictment for Speedy Trial Act Violations, filed Jan. 19, 2021) (hereinafter the "Speedy Trial Motion to Dismiss") (quoting *United States v. Rushin*, 642 F.3d 1299, 1305 n.6 (10th Cir. 2011)).

"Were it otherwise," Mr. Martinez suggested, "the Government could charge a defendant and hold him in captivity based on nothing more than probable cause, and then avoid ever having to bring the case to trial by simply superseding the indictment to add some new charge every time the case got close to trial." *Id.*  He added that "this approach would be limited only by the number of offenses in Title 18 that the Government, presenting *ex parte*, could convince a grand jury to indict a given defendant on, which is about as meaningful a limitation as saying that every forced continuance of a ham sandwich's trial must be supported by some *new* culinary criticism of the ham sandwich as a dish." *Id.*

**f.      The District Court's Speedy Trial Order**

On January 27, 2021, the district court issued a written memorandum opinion and order formally denying Mr. Martinez's Motion to Sever and memorializing its December 13, 2019, Oral Order Continuing Trial, in which it ruled that no Speedy Trial Act violation occurred.  The court concluded that the Speedy Trial clock "(a) did not expire by the time the Court heard and orally denied [Mr. Martinez's] Motion [to Sever]; and (b) has not been violated, because, although the First Superseding Indictment d[id] not reset the Speedy Trial Act clock for the felon-in-possession charge, the pretrial motions [i.e., the government's First Motion to Continue] tolled the Speedy Trial Act clock; the Court granted two continuances; and the Court declared the case complex."  R. Vol. 1, at 111–12 (Mem. Op. & Order, filed Jan. 27, 2021) (hereinafter the "Speedy Trial Order").

More specifically, the district court concluded that the Speedy Trial clock for Mr. Martinez's felon-in-possession charge had not expired because:

> (i) the Speedy Trial Act clock had not expired at the time that the Court heard and orally denied [Mr. Martinez's] Motion [to Sever]; (ii) the Speedy Trial Act clock has never expired; (iii) the Motion [to Sever] tolled the Speedy Trial Act clock for one day, . . . ; (iv) the Court granted a thirty-day and then a ninety-day continuance under 18 U.S.C. § 3161(h)(7) before trial was scheduled to take place; (v) the Joint Motion to Declare the Case Complex tolled the Speedy Trial Act for seven days, . . . ; and (vi) the Court declared the case complex on the parties' joint motion removing the seventy-day Speedy Trial Act clock restrictions . . . .

*Id.* at 168–69 (citations omitted).

Later, when discussing its denial of Mr. Martinez's Motion to Sever, the court observed that "[Mr.] Martinez did not oppose the [government's First] Motion to [C]ontinue [Trial]." *Id.* at 169. "Consequently," the court explained, it "orally granted the United States' Motion to Continue Trial for thirty days on both counts" under the Speedy Trial Act's ends-of-justice provision. *Id.* at 169–70.

The court emphasized that the Speedy Trial clock had not expired at the time it heard—and orally denied—Mr. Martinez's Motion to Sever. In fact, in the court's view, the Speedy Trial "clock ha[d] never expired," as the "Motion [to Sever] tolled the . . . clock for one day," then the court granted, first, a thirty-day and then a ninety-day continuance before trial was scheduled to take place. *Id.* at 168. Afterwards, "the Joint Motion to Declare the Case Complex tolled the Speedy Trial Act clock for seven days," at which point the court's declaration that the case was complex "remov[ed] the seventy-day Speedy Trial Act restrictions." *Id.* at 168–69. Elaborating on the tolling periods, the district court recognized that by the "time that [Mr.] Martinez filed the Motion [to Sever], thirteen days remained on the Speedy Trial Act clock, because no pretrial motions had been filed and fifty-seven days had elapsed." *Id.* And, because the court orally denied Mr. Martinez's Motion to Sever on December 13, 2019, in its Oral Order Continuing Trial the "clock was . . . tolled for one day." *Id.*

Then—critically, for the purposes of this appeal—the court explained that after it "orally denied the Motion [to Sever], [Mr.] Martinez did not oppose the [government's] Motion to [C]ontinue." *Id.* Mr. Martinez contends that this

22

conclusion was factually mistaken—and that the court relied on it when denying his Speedy Trial Motion to Dismiss.

Despite the court's Speedy Trial Order, Mr. Martinez submitted a reply brief regarding his Speedy Trial Motion to Dismiss, noting that "[t]he Court was right before, but is wrong now, in its Speedy Trial Act analysis." *Id.* at 223 (Def.'s Reply in Sup. of his Mot. to Dismiss for Speedy Trial Act Violations, filed Feb. 16, 2021). Specifically, Mr. Martinez argued that:

> [i]f the addition of the RICO count to the previously single-count felon-in-possession indictment did not reset the Speed Trial clock as to the felon-in-possession count—and the [c]ourt rightfully determined that it did not—then either the felon in possession count must be tried (alone or joined with the new charge) before its Speedy Trial clock expires, or there must be some basis for tolling (i.e., "excluding" time from) the felon-in-possession Speedy Trial clock, and *that basis must arise from the felon-in-possession charge*, not merely from its joinder with the new RICO charge; otherwise, the determination that the superseding indictment did not reset the clock for the felon-in-possession charge would be illusory.

*Id.* That is, in district court, Mr. Martinez asserted that the Superseding Indictment's inclusion of a racketeering conspiracy charge could not contribute to the court's assessment of whether to toll the Speedy Trial clock as to his felon-in-possession charge. In that vein, Mr. Martinez observed that no party had argued that a single-count felon-in-possession trial justified an ends-of-justice continuance or any other exclusion from the Speedy Trial Act: "counsel were fully prepared for the trial, the charge wasn't and isn't complex, it wasn't tolled by more than a day due to pretrial motions (as the Court agreed in its [order]), and it didn't require examination[s] to

23

determine the mental competency or involve interlocutory appeals or inter-District prisoner transport or any other statutory bases for tolling." *Id.* at 227 (internal quotations omitted).

Finally, Mr. Martinez challenged the district court's conclusion that he consented to any motions to continue as applied to the felon-in-possession count, noting that he only discussed potential remedies related to the government's First Motion to Continue—for example, the amount of time necessary to prepare a joint trial if the matter was continued—but consistently maintained that he did not wish to enlarge the Speedy Trial Act deadlines for the felon-in-possession charge. Because there was no justification for an ends of justice continuance, and because Mr. Martinez did not consent to any extension of the Speedy Trial clock deadlines, Mr. Martinez asked that the felon-in-possession count be dismissed prior to trial.

### 2.    Legal Framework

"The Speedy Trial Act requires that a federal criminal trial commence within seventy days of the filing of the indictment or the defendant's initial appearance, whichever occurs later." *Banks*, 761 F.3d at 1175. "The Act excludes from this seventy-day period, *inter alia*, '[a]ny period of delay resulting from a continuance . . . if the judge granted such a continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial.'" *Id.* (quoting 18 U.S.C. § 3161(h)(7)(A)). "A court is required to set forth on the record, either orally or in writing, its reasons for making such a determination." *Id*. That said, we have cautioned an ends-of-justice

24

continuance is "meant to be a rarely used tool for those cases demanding more flexible treatment," *United States v. Toombs*, 574 F.3d 1262, 1269 (10th Cir. 2009) (quoting *United States v. Doran*, 882 F.2d 1511, 1515 (10th Cir. 1989)), and "should not be granted cavalierly," *United States v. Williams*, 511 F.3d 1044, 1049 (10th Cir. 2007).

In determining whether to grant an ends-of-justice continuance, the district court must consider the factors listed in 18 U.S.C. § 3161(h)(7)(B). These factors include:

> (i)    Whether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or result in a miscarriage of justice[;]

> (ii)    Whether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section[;]

> . . . .

> (iv)    Whether the failure to grant such a continuance in a case which, taken as a whole, is not so unusual or so complex as to fall within clause (ii), would deny the defendant reasonable time to obtain counsel, would unreasonably deny the defendant or the Government continuity of counsel, or would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for effective preparation, taking into account the exercise of due diligence.

18 U.S.C. § 3161(h)(7)(B).

"If the district court fails to consider [the Speedy Trial Act factors], the continuance period cannot be excluded under the Act's ends-of-justice provision."

*Banks*, 761 F.3d at 1176 (quoting *United States v. Larson*, 627 F.3d 1198, 1204 (10th Cir. 2010)).  "[T]he record must clearly establish [that] the district court considered the proper factors at the time such a continuance was granted."  *Larson*, 627 F.3d at 1204 (alterations in original) (quoting *Toombs*, 574 F.3d at 1268).  If a defendant is not brought to trial within the time limits of the Speedy Trial Act, the indictment shall be dismissed on the defendant's motion.  *See Rushin*, 642 F.3d at 1303 (citing 18 U.S.C. § 3162(a)(2)).  Importantly, "the filing of a superseding indictment does not . . . toll the speedy trial clock" for the offense charged in the original indictment. *United States v. Apperson*, 441 F.3d 1162, 1181 (10th Cir. 2006).

      **3.**     **Analysis**

In assessing Mr. Martinez's Speedy Trial Act challenge, it is helpful to understand, in the first instance, what he does not argue.  He does not argue—as he did in district court—that a superseding indictment entitles a defendant to a severance whenever the speedy-trial clock on an older charge would run before a joint trial can be held or, relatedly, that the basis for any Speedy Trial tolling must originate with the felon-in-possession charge.  Nor does he contend that the court abused its discretion in denying his Motion to Sever.  Moreover, he does not (at least in his Opening Brief) suggest that the court erred, as a matter of law, in concluding that any acquiescence to a 30-day continuance prompted by the addition of the racketeering

26

conspiracy charge was legally sufficient to create an ends-of-justice continuance for his felon-in-possession charge.[4]

Rather, at bottom, Mr. Martinez's speedy trial challenges presented in his Opening Brief are predicated on three modest propositions: (1) the court clearly erred

---

[4]    Mr. Martinez floats additional arguments in his Opening and Reply Briefs. More specifically, in his Opening Brief, Mr. Martinez vaguely targets in a stray, single sentence the legal sufficiency of "the trial court's December 13, 2019, continuance," which he avers "did not serve the ends of justice as to the felon-in-possession charge, and . . . did not operate to exclude time from the felon in possession charge's Speedy Trial clock." Aplt.'s Opening Br. at 34. Relatedly, in his Reply Brief, he argues that the district court's conclusion that discovery needs supported a continuance was "[in]sufficient" because "the record shows that the government superseded [the indictment] to delay trial on the felon-in-possession charge rather than to complete discovery." Aplt.'s Reply Br. at 2. And—also in his Reply Brief—he resurrects a concern that he raised in district court: "whether the government could evade the time limits of the Speedy Trial Act by filing a superseding indictment days before trial, force a continuance, and then assert that a superseding indictment tolls the clock for all charges included in a previous indictment." *Id*. at 5.

Each of these arguments is waived under our briefing-waiver doctrine. "[W]e generally do not consider arguments made for the first time on appeal in an appellant's reply brief," as doing so "'would be manifestly unfair to the appellee who, under our rules, has no opportunity for a written response.'" *United States v. Leffler*, 942 F.3d 1192, 1197 (10th Cir. 2019) (quoting *Hill v. Kemp*, 478 F.3d 1236, 1251 (10th Cir. 2007)). This means that appellants must raise their arguments in their opening brief. *See Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) (noting that "we routinely have declined to consider arguments that are not raised . . . in an appellant's opening brief"). But it is not enough for an appellant to raise arguments there in a "perfunctory manner," *United States v. Walker*, 918 F.3d 1134, 1151 (10th Cir. 2019) (quoting *United States v. Wooten*, 377 F.3d 1134, 1145 (10th Cir. 2004)), or through "scattered sentences" that fail to "'indicate[] . . . appellant's contentions and the reasons for them,'" *United States v. Fisher*, 805 F.3d 982, 991 (10th Cir. 2015) (quoting 10TH CIR. R. 28(a)(8)). Such arguments are "inadequately presented" and we deem them waived. *Bronson*, 500 F.3d at 1104. Thus, Mr. Martinez's alternative arguments—floated, first in cursory fashion in his Opening Brief and then developed in his Reply Brief—are the very kind of "inadequately presented" theories we traditionally deem waived. *Id.*

27

when it claimed in its Speedy Trial Order that he did not oppose the government's First Motion to Continue Trial; (2) the court relied on that mischaracterization in finding that the ends of justice merited a continuance under § 3161(h); and (3) the court's reliance on a clearly erroneous factual finding effected an abuse of discretion. As such, he claims that "there was not a sufficient record establishing that an ends of justice continuance was necessary" because the factual basis for the district court's order was clearly erroneous. Aplt.'s Opening Br. at 34; *see also id.* at 35 ("Relying upon this statement to find that the ends of justice merited a continuance that tolled the Speedy Trial clock was clear error."). And, in the absence of such a record, the district court's "holding of a trial for [the felon-in-possession] charge . . . violated the Speedy Trial Act." *Id.* at 27.

The government responds by arguing that "[t]here is nothing misleading, let alone clearly erroneous, about the court's observation that '[a]fter the Court orally denied [Mr. Martinez's] Motion [to Sever], [Mr.] Martinez did not oppose the [government's] Motion to [C]ontinue.'" Aplee.'s Resp. Br. at 20 (quoting Speedy Trial Order, R., Vol. 1, at 169). Certainly, the government contends, Mr. Martinez "has pointed to nothing in the record that could leave [us] with a 'definite and firm conviction that a mistake has been made.'" *Id.* (quoting *Pulliam*, 748 F.3d at 970).

In our view, the government has the better of this dispute, and we accordingly reject Mr. Martinez's narrow challenge predicated on the district court's ostensible factual error. When read against the "record . . . in its entirety," *Nkome*, 987 F.3d at 1277 —including the procedural background of Mr. Martinez's case and his

28

representations during the pre-trial conference—the district court's statement that Mr. Martinez "did not oppose" the government's First Motion to Continue Trial is best understood as an acknowledgment by the court that Mr. Martinez consented to a continuance *upon condition* of the court's denial of his Motion to Sever.  R., Vol. 1, at 169.  That is, the court's Speedy Trial Order reflects Mr. Martinez's position that he opposed the government's First Motion to Continue Trial as part and parcel of his efforts to sever the racketeering conspiracy and felon-in-possession charges but, to the extent that the court denied his Motion to Sever, he acknowledged needing time to prepare for the joint trial.  *See Piper*, 839 F.3d at 1271.

Because, at the very least, this "'account of the evidence is plausible,'" *id.* (quoting *Anderson*, 470 U.S. at 574), the district court's "finding survives scrutiny and is not reversible," *United States v. Ellis*, 23 F.4th 1228, 1247 (10th Cir. 2022). Consider, first, the procedural backdrop against which the district court made its findings and that, in turn, illuminates Mr. Martinez's conditional consent to an ends-of-justice continuance under the Speedy Trial Act.

The Speedy Trial Order expounded upon, and memorialized, the court's December 13, 2019, oral ruling denying Mr. Martinez's Motion to Sever.  The resolution of the Motion to Sever was inextricably tied to Mr. Martinez's position on the government's First Motion to Continue.  After all, the basis of Mr. Martinez's Motion to Sever was his readiness to proceed to trial on the felon-in-possession charge.  Assenting to the government's First Motion to Continue *prior to* the district court's adjudication of the Motion to Sever would directly undercut Mr. Martinez's

29

efforts to sever the felon-in-possession charge from the racketeering conspiracy charge—as the First Motion to Continue sought to give the parties sufficient time to try *both* charges *together*. In other words, Mr. Martinez was not in a strategic position to consider agreeing to any additional time that the government sought in the First Motion to Continue so long as his Motion to Sever remained viable and the court had not denied it. Accordingly, it is no wonder then that, in its Speedy Trial Order, the district court emphasized that the "primary issue" before it was whether it "should sever [Mr.] Martinez's felon-in-possession of a firearm charge from his racketeering conspiracy charge." R., Vol. 1, at 111.

Mr. Martinez's oral representations to the district court reflect this understanding by him of the connection between the severance and continuance issues. As Mr. Martinez explained during the December 13th hearing, the Motion to Sever needed to be "resolved" before he could fully stake a position on the government's First Motion to Continue. *Id*., Vol. 4, at 100. The district court also understood the interplay between the parties' competing motions. Anticipating its denial of Mr. Martinez's Motion to Sever during the December 13th hearing, the court inquired whether a thirty-day continuance would afford Mr. Martinez sufficient time to prepare a defense. Mr. Martinez underscored that though he was "not waiving anything on [his] severance issue" and did not "consent to a continuance of the felon-in-possession trial," "30 days . . . [was an] appropriate" amount of time to prepare a defense "if [he was] forced to have a joint trial." *Id.* at 144; *see also id.* (representing to the district court that thirty days is "the minimum time [Mr.

30

Martinez] need[ed] to prepare for trial"); *id.* at 143 ("And we thought that for a RICO case, a 30-day continuance made sense on the RICO [charge] for us to get the discovery . . . .").

Indeed, Mr. Martinez explained that, though his "first preference [was] to try a severed felon-in-possession case" at the initially scheduled trial date, his "second preferred position was to . . . try a joined felon-in-possession/[racketeering conspiracy] case" on the initial trial date. *Id.* at 142. Mr. Martinez's second preferred position proved impossible due to the voluminous discovery the government needed to disclose; to proceed to trial without affording Mr. Martinez's counsel an appropriate amount of time to review the 90,000 pages of discovery in the government's possession would severely limit counsel's ability to render effective assistance. Therefore, Mr. Martinez conceded that his "third position was to continue the entire trial." *Id.*

These exchanges make clear that Mr. Martinez agreed to the continuance insofar as the court denied his Motion to Sever and did not consent to the continuance insofar as the court might grant his Motion to Sever.[5] To be sure, even the government acknowledges that Mr. Martinez "could not have made it more apparent that he . . . did not consent to a continuance of [the felon-in-possession] count." Aplee.'s Resp. Br. at 20. And we acknowledge that, if read in isolation, the district court's statement that "[Mr.] Martinez did not oppose the [government's]

---

[5]    As noted, *supra*, Mr. Martinez does not argue on appeal that the district court erred in denying his Motion to Sever.

31

Motion to [C]ontinue," is technically incorrect.   R., Vol. 1, at 169.  However, we "do not read particular statements of the district court in isolation."  *Ellis*, 23 F.4th at 1244.  Returning to the Speedy Trial Order, the district court quoted most of Mr. Martinez's representations that, though not his first choice, he would need a thirty-day runway to prepare if forced into a joint trial.  It is implausible that the district court misinterpreted Mr. Martinez's position so shortly after his explicit opposition to the government's First Motion to Continue.

The Speedy Trial Order reflects that the district court initially continued the joint trial for 30 days, owing to the government's need to disclose some 90,000 pages of discovery related to the racketeering conspiracy charge before trial, and Mr. Martinez's admitted need for additional time to prepare for a joint trial—even though he had sought to avoid a joint trial.  *See* R., Vol. 1, at 169–70 ("Consequently, the Court then orally granted the United States['] Motion to Continue . . . for thirty days on both counts under 18 U.S.C. § 3167(h)(7) . . . ."); *see also* 18 U.S.C. § 3161(h)(7)(B)(iv) ("Whether the failure to grant such a continuance in a case . . . would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for effective preparation. . . .").  Thus, read in the proper context, the Speedy Trial Order's statement that Mr. Martinez "did not oppose," R., Vol. 1, at 169, the government's Motion to Continue—at the very least—is "plausible in light of the record viewed in its entirety," *Anderson*, 470 U.S. at 574.

Mr. Martinez fails to cite any case in which we have found clear error under analogous circumstances.  Accordingly, we cannot say that the district court clearly

32

erred.  And, in the absence of clear error, we cannot agree with Mr. Martinez's narrow, fact-based argument that the district court abused its discretion.  *See United States v. Watson*, 766 F.3d 1219, 1234 (10th Cir. 2014).  We thus affirm.

**B.    The Cumulative and Prejudicial Murder Testimony**

Mr. Martinez next argues that the district court abused its discretion when it admitted "enterprise evidence" consisting of SNM-ordered murders unrelated to him after he "explicit[ly] conce[ded] . . . the criminal enterprise element."  Aplt.'s Opening Br. at 28.  Specifically, he claims that the admission of this evidence violated Federal Rule of Evidence 403.  We provide the factual background pertinent to Mr. Martinez's Rule 403 claim and then discuss the applicable legal framework. We conclude that the district court did not abuse its discretion, as the probative value of the evidence exceeded its prejudicial effect.

**1.    Factual Background**

**a.    Mr. Martinez's Motion in Limine and the District Court's Oral Ruling**

Prior to trial, Mr. Martinez filed a motion in limine seeking to exclude "evidence regarding murders allegedly carried out by SNM members, violent attacks carried out by SNM members, and the alleged SNM plan to assassinate [] former" New Mexico Corrections Department officials.  R., Vol. 1, at 211 (Def.'s Mot. in Lim. to Exclude Evid. of Unrelated Violent Crimes as Enter. Evid., filed Feb. 16, 2021).  More specifically, through that motion, Mr. Martinez sought to exclude at trial any evidence related to the murders of Frank Castillo, Rolando Garza, Freddie

33

Sanchez, Javier Molina, Leroy Lucero, Adrian Burns, and Shane Dix, the attacks on Julian Romero and Jose Gomez, and an alleged conspiracy to murder Gregg Marcantel and Dwayne Santistevan of the New Mexico Corrections Department, all of which were violent crimes that served as the basis for charges in other SNM trials and cases, and none of which involved Mr. Martinez. Mr. Martinez premised his motion on Rule 403, arguing that "[a]dmitting into evidence the alleged murders, violent attacks, and alleged assassination plot . . . would result in an exceptionally high risk that Mr. Martinez [will] be convicted because the jury believes that he, and all alleged SNM members, are the types of persons who would commit murder," rather than for a proper purpose. *Id.* at 221.

The district court granted in part and denied in part the motion. "[T]o limit the amount of time . . . spen[t] on violence," the court decided that if Mr. Martinez conceded in his opening statement that SNM is a racketeering enterprise engaged in murder, witness intimidation, and drug trafficking, then the court would limit the government to presenting evidence of three unrelated murders or attempted assaults as racketeering evidence. *Id.*, Vol. 4, at 208–09 (Trial Tr., Vol. 1, dated Mar. 1, 2021). In response, the government sought clarification as to whether it could "mention . . . other murders" for "explanation purposes," to which the court elaborated that its three-murder rule did not preclude the government from referring to other murders, as doing so might be necessary for witnesses' testimony. *Id.* at 209. Nevertheless, the court advised that if the government was "getting into so many murders," Mr. Martinez could rightfully object. *Id.*

### b.    Mr. Martinez's Opening Statement

Following this ruling, Mr. Martinez explicitly conceded in his opening statement that SNM engaged in racketeering activity:

> We don't dispute any of the following. SNM exists. It's a prison gang. And it's an enterprise under the meaning of [RICO] . . . . As an enterprise, it affects interstate commerce, and through its members it does engage in drug trafficking. That's their primary activity . . . . When anything threatens that, they've been known to threaten and sometimes attack snitches. Murder typically in the same vein, they'll engage in murder of cooperators or whoever else crosses them one way or the other.

*Id.* at 639 (Trial Tr., Vol. 2, dated Mar. 2, 2021).

In light of this concession, the government asked the district court to confirm directly with Mr. Martinez that he agreed to his counsel's decision not to contest certain elements of the racketeering conspiracy charge. The court agreed, and explained to Mr. Martinez, personally:

> I told your counsel and told the government that if you'll not contest—because the government won't stipulate to it; but if you're not going to contest the enterprise, that SNM is an enterprise and that they commit racketeering acts and murder and witness-tampering and those sort of things—if they're willing to not contest those, so they become sort of phantom issues in here; there are still issues the [g]overnment has to prove beyond a reasonable doubt, because they're not stipulating to it. But if you're willing to not contest that and fight those, and those are more phantom issues, then I'm going to put pressure on the government to cut the case down, not have as many murders in this case, not have as many racketeering activities. And I told [the government] they can have three murders and then there are at least some murders that will come up with individual witnesses.

*Id.* at 648–49. Mr. Martinez confirmed that he understood and agreed with what his lawyer was doing.

### c.    The District Court's Clarification

The next day, the government advised the district court that its first witness, Jerry Roark from the New Mexico Corrections Department, would "mention" but not discuss in detail the 2014 murder of Javier Molina, an individual killed at the hands of SNM, and an additional two murders dating back to 2001. *Id.* at 656. The government's notice prompted Mr. Martinez to seek clarification as to the scope of the court's Rule 403 ruling. Specifically, Mr. Martinez asked whether the court would allow "any witness . . . to talk about any murder that they participated in, and then the government could bring in the three additional murders[?]" *Id.* at 657. The court responded that it did not "want to hear multiple witnesses on a [murder] unless it's one of those three" that the government could use as racketeering evidence. *Id.* To the extent the government could discuss additional murders, the court advised that its witnesses' testimony would be limited to "prov[ing] up . . . little murders to try to give some color" to other aspects of the witness testimony. *Id.* Notably, however, the court prohibited the government from "prov[ing] [up] every [murder] . . . mentioned" by its witnesses. *Id.* Should the government solicit "all the details about [the mentioned murder]," the court advised that it would be "receptive to an objection." *Id.* at 658.

### d.    The Murder Testimony

Mr. Martinez complained of enterprise-murder testimony offered by the following witnesses: Mr. Roark, FBI Special Agent Bryan Acee, SNM-member Mario Rodriguez, and SNM-member Roy Martinez.

36

### i.    Mr. Roark

Mr. Roark first testified regarding the history of the SNM, during which he discussed a 2001 double murder at the Southern New Mexico Correctional Facility and the 2014 murder of Javier Molina.  According to Mr. Roark, the double murder occurred on the same day and both victims were members of SNM.  Mr. Roark also described the locations of the murders—prison cell blocks—before briefly discussing the 2014 murder of Javier Molina, another member of SNM.[6]

---

[6]    Mr. Martinez did not contemporaneously object to this testimony. Immediately prior to the commencement of Mr. Roark's direct examination, he sought "to clarify" the Court's Rule 403 ruling.  R., Vol. 4, at 657.  Mr. Martinez's request for "clarification and then [his] explicit decision not to object—upon receiving the . . . clarifying explanation—suggests that [he] knew [he] had the right to object and intentionally chose to relinquish it."  *In re Syngenta*, 61 F.4th 1126, 1220 (10th Cir. 2023) (internal quotations and alterations omitted).  Nor does Mr. Martinez argue that his motion in limine preserved an objection to this testimony. *See United States v. Bedford*, 536 F.3d 1148, 1157 (10th Cir. 2008) ("A pretrial motion in limine to exclude evidence will not always preserve an objection for appellate review.") (quoting *United States v. Mejia-Alarcon*, 995 F.2d 982, 986 (10th Cir. 1993)).  Any such argument would likely be unavailing.  Though a "motion in limine may preserve an objection when the issue . . . can be finally decided in a pretrial hearing, and . . . is ruled upon without equivocation by the trial judge," the district court neither finally nor unequivocally granted—or denied—Mr. Martinez's Rule 403 motion.  *Bedford*, 536 F.3d at 1157–58 (quoting *Mejia-Alarcon*, 995 F.2d at 986).  Rather, in relevant part, the court explained that it would have to evaluate Mr. Martinez's 403 objections as they arose.  Even if we assume (without deciding) that Mr. Martinez's conduct did not result in a waiver of objections to Mr. Roark's testimony, and he only failed to preserve such objections through inadvertence—i.e., forfeited them, *see, e.g.*, *In re Syngenta*, 61 F.4th at 1180 (describing forfeited objections as being  "thought of as the product of inadvertence or ignorance of a legal issue")—Mr. Martinez does not argue plain error on appeal, though he cites to Mr. Roark's testimony in his factual background, and that failure is particularly problematic, if not fatal.  *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1131 (10th Cir. 2011) ("[T]he failure to argue for plain error and its application on appeal . . . surely marks the end of the road for an argument for reversal not first presented to the district court.").

As Mr. Roark explained, the 2001 double murder prompted the New Mexico Department of Corrections to relocate certain SNM members, who were housed in the Southern New Mexico facility, to other prisons located in the state and classify them as maximum-security threats under a system first developed in the 1990s. The New Mexico Department of Corrections has relied on that security threat system, and the threat-mitigation efforts implemented following the 2001 double murder, to counter SNM's organizing efforts from within the state's prison system.

Importantly for our purposes, on cross-examination, however, Mr. Roark acknowledged that Mr. Martinez did not in any way participate in those murders.

---

Mr. Martinez's failure to argue plain error is not limited to Mr. Roark's testimony. As we note, *infra*, Mr. Martinez failed to object to other portions of testimony he now argues on appeal prejudiced him. Notably, Mr. Martinez does not distinguish between the objected-to and unobjected-to testimony in his Opening Brief, which fails to identify in his analysis section the specific testimony he contends unduly prejudiced him. *See, e.g.*, Aplt.'s Opening Br. at 36 ("The enterprise evidence was minimally probative and unfairly prejudicial." (bold typeface omitted)).

Ordinarily, Mr. Martinez would not be able to circumvent our plain error analysis by lumping together forfeited arguments stemming from unobjected-to testimony with preserved arguments related to objected-to testimony. *Cf. Richison*, 634 F.3d at 1131. Nevertheless, the government failed to invoke our preservation doctrine, and thus waived any effective waiver arising from Mr. Martinez's failure to argue that his unpreserved errors satisfied our rigorous plain error standard. *See United States v. Rodebaugh*, 798 F.3d 1281, 1306 (10th Cir. 2015) (finding that "the Government . . . clearly waived . . . any objection to [appellant's] failure to preserve his lack-of-specific-findings argument" where it "failed to argue [that] [appellant] had not objected below and had not argued plain error in his opening brief"). Recognizing that we "are not obliged to apply forfeiture principles to the government's briefing omission," we discern no reason to forgo reviewing Mr. Martinez's Rule 403 claim on the merits. *United States v. McGehee*, 672 F.3d 860, 873 n.5 (10th Cir. 2012).

And, as the government emphasized in its closing argument, the focus of Mr. Roark's testimony was on explaining the development of "SNM's classification within the Department of Corrections, [and] how they started a security threat group in the 1990s to gain intelligence and information about gangs in order to address the problems that the gangs were creating within the prison system." *Id.* at 2771 (Trial Tr., Vol. 11, dated Mar. 15, 2021).

### ii.    Agent Acee

The government then called FBI Special Agent Bryan Acee, one of the lead investigators of the cases against SNM. Initially, Agent Acee testified regarding the murders of Shane Dix; two murders committed by alleged SNM member Edward Troup; and the murders of Rolando Garza, Frank Castillo, Fred Sanchez, and Adrian Burns. Mr. Martinez objected to Agent Acee's testimony, citing Rule 403. The court sustained the objection, instructing the government to move on because "I think we got a flavor." *Id.* at 731 (Test of FBI Special Agent Bryan Acee) (Trial Tr., Vol. 3, dated Mar. 3, 2021). Shortly thereafter, when Agent Acee began testifying again about his investigations into unrelated SNM murders, Mr. Martinez started to object, and the court instructed the government to finish its question but then "move on." *Id.* at 732.

Later, however, the government asked Agent Acee to identify SNM members from a photograph. In doing so, he noted which members were charged for certain crimes. Specifically, he identified the following SNM members, who were either murdered, or charged with murder or assault: Leroy Lucero, murdered after testifying

39

against other SNM members; SNM members Joe Gallegos and Angel DeLeon,

charged with murder; Mauricio Varela, charged with assault; Daniel Sanchez,

convicted of murder; Jerry Montoya, charged with murder; Rudy Salazar, involved in

the murder of David Romero, which was the murder charged in this case; Timothy

Rodriguez, charged with murder; Roy Martinez, charged with conspiracy to murder;

Paul Rivera, charged with assaulting a witness; and Mario Rodriguez, charged with

murder and later cooperated.[7]  In addition, Agent Acee touched upon the Javier

Molina murder.  As he notes in his Opening Brief, Mr. Martinez was not involved

with any of these offenses, a fact that came out on cross-examination.  *See* Aplt.'s

Opening Br. at 13.

### iii.    Mario Rodriguez

Mr. Martinez renewed his Rule 403 objection regarding enterprise evidence as

it applied to the government's next enterprise witness, Mario Rodriguez.  In that

objection, Mr. Martinez stated:

> We've now had testimony regarding seven murders from two
> witnesses.  We spent close to an entire day dealing with this. We've
> conceded that the SNM committed these murders.  We made the
> concession that you asked for, Your Honor. They've now had a
> former deputy director of Corrections and an FBI agent take the
> stand talking about the murder of Javier Molina, the murder of
> Garza, Castillo, Sanchez, Shane Dix, Adrian Burns, and Robert
> Ortega.  Talked about how they were committed by SNM
> members, how they were committed by the SNM Gang as part of
> SNM activities.
>
> At this point, the testimony regarding the enterprise is just
> becoming cumulative and prejudicial.  To now have [Mario

---

[7]    Mr. Martinez did not object to any of this testimony.

Rodriguez] come [] and testify about the Javier Molina murder after two witnesses have already testified about it I think is unnecessary at this point, Your Honor. So, we would ask that Mr. Rodriguez's testimony be limited to his knowledge related to this specific case, and then we move on from this enterprise [testimony.] It's conceded, it's getting cumulative, and frankly, at this point we've hit seven murders, as we've talked about previously, and it's getting prejudicial, Your Honor.

*Id.* at 888–89.

The Court overruled the objection and allowed Mr. Rodriguez to testify regarding his participation in violent activities on behalf of SNM, including the murder of Javier Molina in a New Mexico prison. Mr. Rodriguez testified that he, along with several others, participated in the murder of Javier Molina; SNM wanted him dead over suspicions that he cooperated with law enforcement. Among other details, Mr. Rodriguez shared that another SNM member, Daniel Sanchez, "called," i.e., "order[ed]," the murder. *Id.* at 917, 919. And, critically, he testified that he had "no choice" but to follow Daniel Sanchez's order because, in SNM, "you [follow orders] or you end up getting killed in the process." *Id.* at 923.

### iv.    Roy Martinez

Mr. Martinez prophylactically renewed his Rule 403 objection prior to Roy Martinez, another SNM-member-turned-witness, taking the stand. The government intended for Roy Martinez to testify about two additional murders, as well as a conspiracy involving Mr. Martinez (i.e., the defendant-appellant) to traffic drugs within the prison system.

41

When soliciting testimony as to Roy Martinez's criminal history, the government asked him what he had pleaded guilty to; Roy Martinez answered that he "ordered a hit on Gregg Marcantel and Santistevan," two officers within the New Mexico Department of Corrections. *Id.* at 970. Mr. Martinez objected, noting that the hits had not been "carried out" and that the identities of the two correctional officers were "highly prejudicial." *Id.* at 971. He further argued that the evidence as to SNM's acts of violence against correctional officers was well-established.

The district court disagreed—at least in part. In its view, the background information to which Roy Martinez testified was important to building the government's witness-tampering case against Mr. Martinez because Roy Martinez disseminated his orders via a letter addressed to Mr. Martinez. In that regard, the court observed that the evidence "show[ed] the link between Mr. Martinez and the SNM and the fact that they would trust him with such an important assignment." *Id.* at 972. Nevertheless, the court partially sustained Mr. Martinez's objection, allowing the government to only ask about the letter and that Mr. Martinez never received it.

### e.    The Limiting Instruction

Mr. Martinez filed a proposed limiting instruction to stymie any prejudice attending to the witnesses' testimony. After some discussion and edits from the parties, the district court gave that instruction, stating:

> You have now heard testimony regarding other crimes, wrongs, or acts that were allegedly committed by Mr. Martinez's alleged associates in the SNM. You may consider this evidence solely for the purpose of determining whether the SNM is an enterprise engaged in racketeering activity, and whether and how

the SNM's racketeering acts tended to form patterns of racketeering activity. These acts also may themselves constitute a pattern or several patterns of racketeering activity. I will note that Mr. Martinez, in his opening argument, conceded that the SNM was an enterprise affecting interstate commerce, and that the SNM engages in racketeering acts.

Such acts are not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. You may not consider the bad acts of an SNM member for the purpose of drawing the inference that if Mr. Martinez associated with such individuals, he must have a criminal character and must have committed the crimes charged.

You also may not consider the alleged bad acts of Mr. Martinez himself for the purpose of drawing the inference that Mr. Martinez's bad acts in the past mean that he is a person of criminal or otherwise bad character and that it is thus more likely that he committed the crimes charged in this case. For the limited purpose for which this evidence has been received, you may give it such weight as you feel it deserves. You may not, however, use this evidence for any other purpose not specifically mentioned.

*Id.*, Vol. 4, at 2689–90.

### 2.    Legal Framework

Under Rule 403 of the Federal Rules of Evidence, district courts must conduct a balancing test to assess whether a piece of evidence's "probative value is substantially outweighed by [the] danger of . . . unfair prejudice." FED. R. EVID. 403. In this context, "unfair prejudice" means "an undue tendency to suggest [a] decision on an improper basis, commonly, though not necessarily, an emotional one." *United States v. Silva*, 889 F.3d 704, 712 (10th Cir. 2018) (alteration in original) (quoting FED. R. EVID. 403 advisory committee note to 1972 proposed rules). "[A]s to a criminal defendant, [it] speaks to the capacity of some concededly relevant evidence

to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). "In deciding whether to exclude evidence under Rule 403, 'consideration should be given to the probable effectiveness or lack of effectiveness of a limiting instruction" and '[t]he availability of other means of proof.'" *Silva*, 889 F.3d at 712 (alteration in original) (quoting FED. R. EVID. 403 advisory committee note to 1972 proposed rules).

"The district court has considerable discretion in performing the Rule 403 balancing test," but "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules 'is an extraordinary remedy and should be used sparingly.'" *United States v. Tan*, 254 F.3d 1204, 1211 (10th Cir. 2001) (quoting *United States v. Rodriguez*, 192 F.3d 946, 949 (10th Cir. 1999)). The district court need not expressly state whether "the probative value of the evidence substantially outweighed its potential for unfair prejudice" where "th[ose] determinations are supported by the record." *United States v. Lazcano-Villalobos*, 175 F.3d 838, 846 (10th Cir. 1999). Finally, "our law *favors* admission of all relevant evidence not otherwise proscribed." *United States v. Irving*, 665 F.3d 1184, 1213 (10th Cir. 2011).

### 3.     Analysis

Mr. Martinez argues that "the balance tipped so sharply towards exclusion following [his] concession that the SNM was a criminal enterprise [] that the district court's admission of [the enterprise murder] evidence was an abuse of discretion." Aplt.'s Opening Br. at 36. That is, "because Mr. Martinez conceded that the SNM

44

was a racketeering enterprise that engaged in racketeering activities such as murder, . . . the evidence of other murders . . . by the SNM had no probative value" and was severely prejudicial. *Id.* at 37.

We disagree and conclude that the district court did not abuse its discretion for two reasons. First, the enterprise-murder evidence had important probative value by showing that SNM used violence to maintain and augment organizational respect; such evidence played a critical role in establishing the government's case on elements Mr. Martinez *did contest*, including his participation in the murder of David Romero. Second, with the assistance of a limiting instruction, this probative value exceeded any unfair prejudice.

### a.    Probative Value

Mr. Martinez argues that the evidence lacked probative value for two reasons. First, he reasons that his trial revolved around whether he "participated in the [David] Romero murder, and other racketeering activity, . . . not . . . whether the SNM was a racketeering enterprise in general." *Id.* at 38–39. So, Mr. Martinez maintains that his concession of the enterprise element significantly diminished the probative value of the evidence. In furthering this argument, he invokes our decisions in *United States v. Becker*, 230 F.3d 1224 (10th Cir. 2000), *abrogated in part on other grounds by Crawford v. Washington*, 541 U.S. 36 (2004), *United States v. Soundingsides*, 820 F.2d 1232 (10th Cir. 1987), and *United States v. Edwards*, 540 F.3d 1156 (10th Cir. 2008)—as well as a Tenth Circuit panel's decision in *United States v. Moncayo*, 440

45

F. App'x 647 (10th Cir. 2011)—for the proposition that a defendant's concession of an element deprives evidence concerning that element of its probative value.

Second, and relatedly, Mr. Martinez argues that the enterprise murder evidence was "wholly separate and distinct from the [David] Romero murder charged in this case." Aplt.'s Opening Br. at 38. In that regard, many of the murders occurred either several years before or after the 2008 murder of David Romero. Thus, Mr. Martinez urges that these murders "hardly" established that "the SNM was engaged in racketeering activity in 2008—or, for that matter, that Mr. Martinez was active in the SNM in 2001 or 2014," when some of the murders took place. *Id.* That is, in Mr. Martinez's view, the murders were so temporally disconnected from his alleged murder of David Romero that they lacked probative force concerning the elements of that alleged murder.

For its part, the government emphasizes that none of these cases that Mr. Martinez cites involved racketeering charges. Moreover, the government responds that the jury "had to find that [SNM] had three structural features: (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit [its] associates to pursue the enterprise's purpose," in addition to finding that SNM "engaged in multiple acts of racketeering activity consisting of murder, obstruction of justice or witness tampering, or drug trafficking." Aplee.'s Resp. Br. at 29 (internal quotations omitted). To that end, the government contends that "[t]he evidence of violent acts committed by SNM members was strong proof of these elements" because, by showing "that members had committed murders on SNM's

behalf," the evidence "showed that [SNM] was engaged in murder, one of the specific racketeering activities alleged." *Id.* at 30. Likewise, "evidence that SNM members followed orders . . . went towards establishing the SNM's leadership structure and rules, and thus its existence as an enterprise." *Id.*

And, of course, the government also had to prove that Mr. Martinez "murdered [Mr.] Romero 'to maintain or increase his position in' . . . the SNM," and "[t]he evidence of SNM's violent acts helped to establish that violence is essential to one's status in the gang." *Id.* at 31 (quoting Supp. R., Vol. 1, at 59 (Court's Final Jury Instr. No. 30)). The government posits that the evidence showing that the "SNM expected acts of disrespect to be punished severely" helped explain why Mr. Martinez "would believe that punishing [Mr.] Romero's disrespect would enhance his own standing" in the gang. *Id.* Because Mr. Martinez disputed "his intent to advance his position in [SNM]," the government argues that the disputed evidence was relevant beyond the parameters of establishing SNM as a violent enterprise. *Id.*

After carefully studying Mr. Martinez's arguments and the caselaw he relies on, we conclude that the government has the better of this dispute. For starters, generally, a defendant cannot deprive the government of the opportunity to present a rich, nuanced case establishing guilt by offering abstract concessions and stipulations. In that regard, the enterprise murder evidence could be—and was— probative across multiple vectors. None of the cases on which Mr. Martinez relies state otherwise.

47

Relatedly, insofar as Mr. Martinez argues that his concession categorically prohibited the government from introducing enterprise murder evidence, "a criminal defendant may not stipulate or admit his way out of the full evidentiary force of [his] case." *Old Chief*, 519 U.S. at 186. Accordingly, we are "general[ly] reluctan[t] to tell the government how to prove a particular element," and have limited the introduction of evidence "in the face of a stipulation only when the element involves the defendant's status as a convicted felon." *United States v. Herrera*, 51 F.4th 1226, 1256 (10th Cir. 2022).

*Old Chief*'s limiting principles are strongly at play here, where "a piece of evidence may address any number of separate elements, striking hard just because it shows so much at once." 519 U.S. at 187. The multifunctional value of the evidence at issue in this case is a well-recognized feature of racketeering conspiracy cases generally. *See, e.g.*, *United States v. Turkette*, 452 U.S. 576, 583 (1981) (recognizing that "proof used to establish . . . separate [RICO] elements may in particular cases coalesce"); *United States v. Hutchinson*, 573 F.3d 1011, 1021 (10th Cir. 2009) ("[E]vidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce.'" (quoting *Boyle v. United States*, 556 U.S. 938, 947 (2009)); *cf. Boyle*, 556 U.S. at 947 ("[I]f [a jury instruction] is used to mean that the existence of an enterprise may never be inferred from the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity, *it is incorrect*." (emphasis added)). Furthermore, contrary to Mr. Martinez's argument that the enterprise murder evidence's probative

48

value was limited to whether the "SNM was a racketeering enterprise that engaged in racketeering activities such as murder, witness intimidation, and drug tracking"—and those were matters that he already had conceded—the enterprise murder evidence presented at trial could (and did) apply to elements that Mr. Martinez disputed.[8] Aplt.'s Opening Br. at 37.

Central to the government's case against Mr. Martinez was the importance of respect and the use of violence to acquire—and maintain—it. In SNM, "respect" is the central marker of "status"—and "status" accords valuable benefits, like access to drugs. R., Vol. 4, at 897. And, more specifically as it relates to the government's burden, as the government urged during its closing argument, "to understand what happened to David Romero, to understand what happened to Donald Salazar, . . . you have to understand how it is that the SNM operates." *Id.* at 2774–75. That is, "[y]ou have to understand that respect is everything," including life and death, and that murder is how respect is maintained. *Id.*

---

[8] The VICAR and racketeering conspiracy statutes are substantially similar and define "enterprise" the same way: "any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." The only difference is that VICAR includes an interstate commerce requirement within the definition of enterprise, whereas RICO places that element within each substantive provision. *Compare* 18 U.S.C. § 1959(b)(2) with 18 U.S.C. §§ 1961(4), 1962(a)–(c). Due to their substantial overlap, the Supreme Court's observation that proof of a RICO enterprise may "coalesce" with proof of other RICO elements supports the proposition that enterprise evidence may have a similarly coalescent effect here as to the VICAR charge. *Turkette*, 452 U.S. at 583.

SNM's trail of bloodshed—even presented in a limited fashion as here—offered valuable context as to why Mr. Martinez would murder his cousin over a bag of heroin and shoot Donald Salazar over seemingly childish trash talk. And, because those facts *were* contested, the district court did not abuse its discretion when concluding that Mr. Martinez's "explicit[] and unambiguous[] conce[ssion] before the jury" that SNM is a violent racketeering enterprise did not deprive the enterprise murder evidence of its probative worth. Aplt.'s Reply Br. at 9.

The government not only showed the role "respect" and its counterpart, "disrespect," had in augmenting or undercutting a member's status, but also its role in maintaining organizational power from within and without the prison system. *See, e.g.*, *id.* at 2060 (Billy Cordova testifying: "That means when you disrespect one carnal, you disrespect all of us. It's more about not only looking weak but even people thinking that we're weak. We try to keep our status by instilling fear in other people. So, if you move on one of us, we move back on you."). In establishing respect as SNM's chief currency, the government also demonstrated that, in SNM, to tolerate disrespect is to risk social bankruptcy and even death. *See, e.g.*, *id.* at 897 (Mario Rodriguez testifying: "If you're disrespected . . . [from] even within, if you don't do something about it . . . . [y]ou pretty much get knocked off.").

Violence, then, became SNM's go-to tool to secure respect—and thus power—over people in the prisons and on the streets. Recall that Mario Rodriguez testified that SNM "expected" new entrants "to continue to live up to the history of the organization, the violence." *Id.* at 895. To that end, according to him, SNM

50

expected its members to "kill" law enforcement cooperators, among others. *Id.* at 893. With this background in mind, another witness, Roy Martinez, explained that he participated in the murder of Javier Molina because SNM suspected that Javier Molina cooperated with law enforcement.

However, echoing the comments of SNM member Mario Rodriguez, Roy Martinez also stressed that, though SNM rewarded carnals who murdered its enemies, a carnal's failure to follow orders would result in his own death. *See id.* at 923 (testifying that SNM members "had no choice" but to follow orders because the failure to follow orders would "get[] [one] killed in the process"); *see also id.* at 950 ( testifying that he "killed for the SNM" to "become a leader," and that the failure to follow orders would result in a member's own death). Likewise, Agent Acee's brief testimony regarding the many murders attributed to SNM members gave the jurors a flavor of the exceptional body count resulting from SNM's systematic exercise of violence to maintain power.

Lastly, it would have been odd for the government to delve into the organizational dynamics and social mores of SNM without substantively—as opposed to abstractly—establishing that it was an organization in the first place. To that end, Mr. Roark's (unobjected-to) testimony regarding the 2001 double murder and Mr. Molina's murder—as well as Agent Acee's testimony regarding the government's efforts to identify cooperators and the difficulties plaguing their investigations of SNM—gave "descriptive[ly] rich[]" glimpses of SNM as an organization—including its scale, power, and influence—in a way that Mr.

51

Martinez's abstract concession could not. *Old Chief*, 519 U.S. at 187; *see* R., Vol. 4, at 713–714 (Agent Acee testifying that the government was able to prove the cold case murder of Shane Dix after a SNM member began cooperating); *id.* at 728–29 (testifying that the government was unable to prove two prison murders at the hands of SNM member Edward Troup until long after his release).

In advising that the enterprise murder testimony was necessary "to give some color" to the prosecution's case over elements Mr. Martinez continued to contest, *id.* at 657, the district court implicitly recognized that the evidence had "force beyond any linear scheme of reasoning," *Old Chief*, 519 U.S. at 187. Such a recognition is entirely consistent with the Supreme Court's observation that evidence of a conceded issue may still be necessary to "tell[] a colorful story with descriptive richness." *Id*.

Put differently, giving the enterprise murder evidence at issue here its "maximum reasonable probative force," *Herrera*, 51 F.4th at 1262, added critical context to the VICAR and felon-in-possession charges levied against Mr. Martinez.[9] The government had to explain why Mr. Martinez felt motivated to kill his cousin, Mr. Romero, over a stolen bag of heroin and shoot Donald Salazar over his post-prison bravado. Coupling the body count with evidence that slights reflected both an existential threat to a member's place in the organization and an opportunity—if

---

[9] Mr. Martinez does not contest on appeal that the government had the right to proffer evidence as it related to his motive to murder Mr. Romero. In failing to do so, he waived any argument that the enterprise murder evidence was not probative as to that element. *See Sawyers v. Norton*, 962 F.3d 1270, 1286 (10th Cir. 2020) ("Issues not raised in the opening brief are deemed abandoned or waived." (quoting *Tran v. Trs. of State Colls. in Colo.*, 355 F.3d 1263, 1266 (10th Cir. 2004))).

responded to violently—for advancement, helped the jury understand the motives behind Mr. Martinez's charged conduct. As such, we could hardly call the evidence "inconsequential." *Soundingsides*, 820 F.2d at 1237.

None of the cases that Mr. Martinez cites undercut this conclusion. None of them arise in the racketeering context where evidence may serve multiple purposes and not just operate to prove discrete elements. Furthermore, in most of the cases he cites, the evidence was marshalled with regard to elements that were not even disputed.

Start with *Becker*, where we held that evidence of prior bad acts—*viz.*, drug crimes—had little probative value where they occurred four-to-six years before, and bore only facial similarity to, Mr. Becker's current drug charges. *See* 230 F.3d at 1232–33. More specifically, in that case, the government sought admission of Mr. Becker's conviction to show motive and intent. *See id.* at 1232. Over Mr. Becker's objection, the district court admitted evidence of Mr. Becker's prior adjudication— specifically, his guilty plea—as a drug dealer under Federal Rule of Evidence 404(b). *See id.* at 1232–33.

On appeal, we reviewed the evidence's relevance against our longstanding rule that "prior narcotics involvement is relevant when that conduct is 'close in time, highly probative, and similar to the activity with which the defendant is charged.'" *Id.* at 1232 (quoting *United States v. Wilson*, 107 F.3d 774, 785 (10th Cir. 1997), *abrogated on other grounds as recognized by United States v. King*, 632 F.3d 646, 651–52 & n.5 (10th Cir. 2011)). Mr. Becker's guilty plea, which "preceded the

53

incident [giving rise to his federal prosecution] by approximately six years," fell far outside the scope of the Rule 404(b) exception. *Id.* Accordingly, we found that "the relevance of [Mr.] Becker's prior convictions [was] undermined by the length of time between the prior acts and the conduct involved in the instant convictions." *Id.* In addition, we concluded that the "bare evidence" of Mr. Becker's guilty plea—as opposed to evidence of "the underlying factual circumstances"—precluded a comparison of his prior and present charges. *Id.* at 1233. Consequently, we could not say that the evidence of the prior charge was relevant and, furthermore, could not conclude that the prior bad act was more probative than prejudicial. *See id.*

*Soundingsides* also considered the relevance of prior bad acts evidence in the context of a charge of second-degree murder. *See* 820 F.2d at 1236–37. There, we concluded that the district court abused its discretion when it admitted testimony from Mr. Soundingsides's ex-girlfriend of the daily beatings she endured at his hands—including one resulting in her miscarrying a baby—from five years prior to the alleged murder. *See id.* at 1237. The government sought to use the evidence to prove malice aforethought—an element of the charged offense. *See id.* at 1236. However, notably, that was not an element that Mr. Soundingsides put at issue. *See id.* at 1237.

We determined that the testimony lacked probative value because Mr. Soundingsides never raised "intent" as a defense and reasoned that the government could have proved malice aforethought from other sources of evidence, namely photographs of the crime scene and expert testimony that a struggle occurred. *Id.*

54

Accordingly, we concluded that "the incremental probative value of the extrinsic offense is inconsequential when compared to its prejudice" where "the defendant's intent is not contested." *Id.*

Similarly, in *Edwards*, a drug distribution case, we concluded that the district court abused its discretion when it admitted evidence of the defendant's prior drug convictions to prove a question not in issue. *See* 540 F.3d at 1163. We found that the evidence, consisting of convictions for possessing small quantities of cocaine and marijuana, was irrelevant for the government's "purported purpose[]" of establishing "lack of mistake"—a question that "was never an issue [in] th[e] case." *Id.* Compounding matters further, we also determined that the dissimilarity between the prior convictions and the present charges undermined their relevance in Mr. Edward's prosecution. *See id.* ("Likewise, we are unable to discern how evidence that [Mr. Edwards] possessed personal-usage amounts of controlled substances [was] relevant to show that he intended to distribute narcotics in the instant case.").

A panel of our court exhibited similar concerns in *Moncayo*, where it concluded that "[t]he minimal relevance" attending to an officer's testimony of the defendant's prior drug activity was "significantly diminished by the fact that [the officer's] testimony was relevant only to an undisputed element of the case." 440 F. App'x at 654. The officer testified that, in the year before the incidents giving rise to the federal prosecution, the officer had observed Mr. Moncayo drop an object— ultimately determined to be a clear plastic bag containing several baggies of cocaine—into the engine block of a car. *See id.* at 651. The government urged that

55

the testimony tended to show Mr. Moncayo's intent regarding the charged offenses. *See id.* at 652. Disagreeing, the panel found that "factual differences between the prior 2007 incident and the 2008 charges . . . undermine[d] the government's argument that the 2007 incident was relevant to establish [Mr.] Moncayo's intent to distribute." *Id.* at 653. In fact, the evidence's "only . . . probative value" went to two issues that Mr. Moncayo "did not dispute"—"quantity" and "tools of the drug trade." *Id.* at 654.

As pertinent here, what all of these cases have in common is that *none* arise "in a racketeering [context] in which the government was required to prove an enterprise and a defendant's purpose in committing the crime." Aplee.'s Resp. Br. at 34. Yet, that context is of critical importance to our assessment of the challenged evidence's probative value. Moreover, each of these cases involved relevance determinations based on discrete issues, which most often were not even in dispute. Here, by contrast, the enterprise murder evidence's probative value is not siloed to the discrete issue of SNM's status as an enterprise or its history of racketeering acts. Rather, as explained *supra*, it bears on other issues that Mr. Martinez contested at trial.

Specifically, the racketeering context places into full view the nature of Mr. Martinez's misplaced reliance on *Becker*, *Soundingsides*, *Edwards*, and *Moncayo*. Unlike the years' old drug convictions at issue in *Becker*, evidence of SNM's long history of violence from within and without the prison system was not used to "impermissibly establish[] [Mr. Martinez's] propensity to commit the crimes

56

charged," *Becker*, 230 F.3d at 1232, but rather to demonstrate the gang's tried-and-true use of violence—notably, through murders—to maintain "status by instilling fear in other people" and the promotional opportunities that came through killing. R., Vol. 4, at 2060. *Soundingsides* also is distinguishable on that basis. And, even further, it is distinguishable because Mr. Martinez's "intent to advance his position in the gang"—an element of his VICAR charge—was disputed. Aplee.'s Resp. Br. at 31; *cf. Tan*, 254 at 1209 ("*Soundingsides* is distinguishable from this case. Most important, intent is at issue here."). So too with *Edwards* and *Moncayo*.

In sum, as *Old Chief* instructs, "[a] syllogism is not a story, and a naked proposition in a courtroom may be no match for the robust evidence that would be used to prove it." 519 U.S. at 189. Accordingly, Mr. Martinez is wrong to suggest that his concession functioned as a firewall against the admission of other enterprise and racketeering evidence. Moreover, the enterprise murder testimony had probative value. Thus, the only way that the district court could have abused its discretion here would be if the evidence's prejudicial effects substantially outweighed its probative value. But, as discussed *infra*, that was not so.

### b.    Prejudicial Effect

The district court did not abuse its discretion because the probative value of the contested evidence was not outweighed—let alone substantially outweighed—by the danger of any unfair prejudice stemming from that evidence. Mr. Martinez argues that the evidence was unfairly prejudicial because it could "lure the [jury] into declaring guilt by generalizing another's guilt, the association with which becomes a

57

bad character trait that made Mr. Martinez more likely to commit the charged offenses."  Aplt.'s Opening Br. at 40.  He reasons that the risk the jury would use guilty-by-association to find him guilty for "his alleged involvement in the Romero murder, witness intimidation, and being a felon-in-possession of a firearm" was "exceptionally high" considering the enterprise murder evidence, which established that Mr. Martinez's compatriots engaged in similar criminal conduct.  *Id.*; *see also* Aplt.'s Reply Br. at 10 (arguing that the "RICO statute has . . . tremendous potential for guilt by association" and that the enterprise evidence was prejudicial because "in no way did it connect [him] to the enterprise" (quoting *United States v. Flynn*, 852 F.2d 1045, 1054 (8th Cir. 1988))).

The government responds that "SNM's other violent acts carried a low risk of unfair prejudice to [Mr.] Martinez" for three reasons.  Aplee.'s Resp. Br. at 34.  First, "the enterprise evidence about which [Mr. Martinez] complains involved crimes committed by other SNM members," and Mr. Martinez "was not implicated in any of them."  *Id.*  Second, the "details about the other crimes were generally sparse" and did not overpower the "violent and disturbing" testimony concerning the murder of Mr. Romero, which Mr. Martinez himself placed at the center of trial.  *Id.*; *accord* Aplt.'s Opening Br. at 38 (arguing that "this trial was entirely about whether [he] participated in the Romero murder, and other racketeering activity, in particular").  Third, and finally, the court supplied a limiting instruction directing the jury to not "infer [Mr.] Martinez's guilt from the bad acts of other SNM members."  Aplee.'s Resp. Br. at 35.  We agree with the government.

58

We conclude that any potential unfair prejudice did not "substantially outweigh the probative value" of the enterprise murder evidence such that the evidence might be "excluded under Rule 403." *United States v. Archuleta*, 737 F.3d 1287, 1293 (10th Cir. 2013) (quoting *Irving*, 665 F.3d at 1213–14). As we said in *Herrera*, "given the nature of this violence infested case," there is "no reason why testimony about an additional murder would cause the jury an improper emotional reaction." 51 F.4th at 1260 (quoting *United States v. Cruz-Ramos*, 987 F.3d 27, 43 (1st Cir. 2021)). This is especially so considering that Mr. Roark's and Agent Acee's testimony involved only a cursory review of the murders and did not link them to Mr. Martinez. *See, e.g.*, R., Vol. 4, at 689–90 (Jerry Roark testifying that Mr. Martinez was not involved in SNM-related prison murders he referenced in his testimony); *id.* at 840 (Agent Acee testifying that Mr. Martinez was not involved in the murder of an SNM member who cooperated with law enforcement).

Moreover, the district court instructed the jury that it could not infer Mr. Martinez's guilt from the bad acts of other SNM members. And, as we have said, "[e]ven if actual prejudice exists, the court can often cure the prejudice through 'less dramatic measures, such as limiting instructions.'" *Herrera*, 51 F.4th at 1273 (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)).

We generally "presume that juries follow limiting instructions," and Mr. Martinez certainly points to no evidence that the jurors disregarded the instructions here. *United States v. Jones*, 530 F.3d 1292, 1303 (10th Cir. 2008) (alteration omitted) (quoting *United States v. Lane*, 883 F.2d 1484, 1498 (10th Cir. 1989)); *see*

59

*Jones*, 530 F.3d at 1303 (presuming that jurors followed the limiting instruction where there was "no reason to conclude that the jury did not follow the court's limiting instruction"). Indeed, the jury here heard evidence that SNM routinely intimidated witnesses (another fact Mr. Martinez conceded) but nevertheless acquitted Mr. Martinez of the witness intimidation charge. As we acknowledged in *Herrera*, that "acquittal suggests that the jury could follow the instructions by compartmentalizing the evidence." 51 F.4th at 1266 n.11. Thus, absent any evidence to the contrary, we presume that the limiting instruction here served to cure any unfair prejudice.

As such, we conclude that any unfair prejudice stemming from the district court's admission of certain enterprise murder evidence did not outweigh—let alone substantially outweigh—the evidence's probative value. Therefore, we uphold the district court's judgment in the face of Mr. Martinez's Rule 403 challenge.

## C.    The Recusal Issue

We now turn to the final issue in this case: whether the presiding district court judge—Judge Browning—abused his discretion in declining to grant a new trial because of Mr. Martinez's involvement in SNM's threats against him.[10] After

---

[10]    To be clear, as it relates to this recusal issue, when the district court judge and the parties refer to threats against "the Court," they appear to be universally referring to threats of personal harm against Judge Browning, who presided over Mr. Martinez's trial. In a related vein, when we refer in this part of the opinion to the "district court judge" or "judge" or linguistic variants thereof, we also are referring to Judge Browning.

reviewing the relevant factual background and applicable legal framework, we conclude that the district court judge did not abuse his discretion.

### 1.    Factual and Procedural Background

#### a.    Agent Acee's Testimony

The recusal issue springs from Agent Acee's testimony involving arrests he made during the morning of trial. Specifically, at the end of direct examination, the government and Agent Acee had the following exchange:

| | |
|---|---|
| The government: | And in terms of the gang being alive and well, you mentioned arresting somebody earlier, in recent weeks, with 30 pounds of methamphetamine. Did you arrest anybody even this morning before court who were SNM gang members? |
| Agent Acee: | I arrested four SNM gang members this morning and one two days ago. |
| The government: | And did you locate any evidence of crime in relation to those arrests? |
| Agent Acee: | Yes. The one two days ago, I recovered a loaded firearm. And this morning we recovered four guns and methamphetamine and heroin. |

R., Vol. 4, at 809.

Following this testimony, defense counsel asked to approach and requested discovery related to those recent arrests. Counsel also asked whether the government was contending that the arrests were related to Mr. Martinez. The government responded by saying:

61

> No, they have nothing to do with the defendant, and I have no objection to him asking a little about it. Well, the stuff this morning relates to this case, but not directly to the defendant. It relates to threats against a witness, and I didn't want to bring that out in front of the jury.

*Id.* at 810; *see also id.* at 811 ("Mr. Martinez: And the four arrests are all related to witness intimidation? The government: It [sic] tends to be. We're looking at that."). By way of discovery, the government then supplied Mr. Martinez with a ninety-eight-page sealed affidavit signed by Agent Acee related to the arrests.

Later, on cross examination, defense counsel asked Agent Acee: "You had mentioned a plot to kill *FBI agents* and *prosecutors*." *Id.* at 834 (emphases added). Agent Acee responded in the affirmative and then testified that Mr. Martinez was involved in two such threats. At this juncture, Agent Acee had not discussed any threats or plots against any judge—let alone the presiding district court judge.

However, near the end of cross-examination, defense counsel and Agent Acee had the following exchange:

| | |
|---|---|
| Mr. Martinez: | [S]o, . . . I just wanted to go and . . . close off the threats against FBI agents and prosecutors, just for completeness. I think there was a *judge's name* . . . float[ing] [in] one of those [threats]; is that correct?" |
| Agent Acee: | Yes. |
| Mr. Martinez: | Nobody was actually killed or attacked arising from those threats; correct? |
| Agent Acee: | Not yet. I don't know that they're over. |
| Mr. Martinez: | Not yet? |

| Agent Acee: | It took them two years to get [a murder victim]. |
| | . . . . |
| Mr. Martinez: | Are there any charges arising from the threats against *FBI agents, prosecutors*? |
| Agent Acee: | I arrested four people this morning. |
| Mr. Martinez: | And obviously, none of that stuff has been produced to the defense? |
| Agent Acee: | I haven't even written a report yet.  I came here.  I changed clothes and came here. |

*Id.* at 842–43 (emphases added).

### b.        The Arrest Warrant Affidavit

As noted, the government disclosed a search warrant affidavit to Mr. Martinez. Ninety-eight pages long, the affidavit detailed threats that SNM members issued against federal law enforcement officers, federal prosecutors, and the presiding district court judge.  *See, e.g.*, *id.*, Vol. 2, at 82–83 (Def.'s Sealed Mot. for a New Trial, filed Apr. 13, 2021) (hereinafter the "Rule 33 Motion") (noting that the affidavit provided that "[o]ver the past several weeks, case agents have become aware of numerous threats aimed at government witnesses, federal prosecutors, FBI agents, and the presiding judge in the United States' case against the SNM").

As revealed in the affidavit's averments, Mr. Martinez was not the principal target of the FBI's investigation.  In fact, his name came up only at the end of the affidavit in two paragraphs.  However, the affidavit stated that Mr. Martinez and others "discuss[ed] putting a green light on '[Agent] Acee, [Assistant U.S. Attorney]

Armijo, and [Judge] Browning,' and lighting up the courtroom when the case(s) went

to trial." *Id.* at 83.

### c.    Mr. Martinez Moves for a Mistrial

During trial, and after reviewing the affidavit, Mr. Martinez moved for a

mistrial—notably, *not* based on any recusal issue but, rather, based on the

government's alleged failure to timely disclose information.  *See* R., Vol. 4, at 859

("Mr. Martinez is . . . moving for a mistrial . . . based on the failure to disclose the

information that Agent Acee testified to and was elicited on cross about the [arrests

of SNM members] that happened this morning.").  The district court judge denied

Mr. Martinez's motion without prejudice.  Mr. Martinez does not challenge this

ruling on appeal.

Though Mr. Martinez did not raise a recusal concern in his oral motion for a

mistrial, his argument on appeal relies extensively on his oral motion and the issues

he raised therein.  *See* Aplt.'s Opening Br. at 20 (arguing that his oral motion for a

mistrial "made clear that, based upon Agent Acee's testimony, the discovery

provided to Mr. Martinez, and the search warrant affidavit, that Mr. Martinez was

allegedly involved in threats against the Court").  In particular, he claims that the

following defense argument put the district court judge on notice that Mr. Martinez

had made threats against him:

> Special Agent Acee testified that the Government was in
> possession of information regarding alleged threats that happened
> when Mr. Martinez was incarcerated in Santa Fe.  It's been more
> than a year since he was incarcerated in Santa Fe.  It certainly lends

credence to the fact that the government has had this information before this morning.

And also, Your Honor, as I stated—and we can enter it into the record, if you'd like—we did receive a 302 in discovery in February, last month, dated January 19, 2021, where Special Agent Stemo stated that she was listening to recordings. Now, she does not say that they're investigating threats. All she states is—and this is a quote—"It does not appear that any information pertaining to hits on AUSA Maria Armijo, SA Bryan Acee, or Judge Browning was exchanged during these interactions."

The Government knew that these [threats] existed. The Government was investigating it, but made no disclosure prior to Special Agent Acee testifying in this trial. That's prejudicial. We obviously would have approached this very differently. All of the instances of what is disclosed in trial and what is disclosed in discovery of any alleged threats against the Court, the FBI agents, or the federal prosecutors in this case *don't mention Mr. Martinez whatsoever*. They [only] refer to prior threats from prior trials . . . .

R., Vol. 4, at 861–62 (Trial Tr., Vol. 3, dated Mar. 3, 2021) (emphasis added). As noted, the district court judge denied his motion.

### d.    Mr. Martinez's Motion for a New Trial

Following the jury's verdict, Mr. Martinez moved for a new trial under Federal Rule of Criminal Procedure 33. In his motion, Mr. Martinez claimed that he was entitled to a new trial because the district court judge failed to recuse himself after he heard testimony and argument, and reviewed a written affidavit detailing Mr. Martinez's alleged threats against him.

More specifically, Mr. Martinez claimed that "during trial, it came to the Court's attention that Special Agent Acee applied for a search warrant and stated in that warrant that he 'is aware certain members of the gang [SNM] have advocated for

65

FBI agents, federal prosecutors, and the presiding judge to be harmed.'" *Id.*, Vol. 2, at 148 (Def.'s Sealed Reply to the Gov.'s Sealed Resp. to Def.'s Sealed Mot. for New Trial, filed Jun. 1, 2021) (quoting the Acee Aff.). Thus, based on the contents of the search warrant, Mr. Martinez submitted that there was "a reasonable factual basis for calling the Court's impartiality into question, objectively speaking." *Id.* And he posited that "having a trial conducted by a judge who objectively speaking is not impartial . . . is the kind of injustice Rule 33 is designed to correct." *Id.* at 147. In like manner, he asked the judge to recuse himself from his sentencing because "a reasonable person would have an objective basis for questioning [his] impartiality." *Id.* at 150.

During a subsequent hearing on Mr. Martinez's Rule 33 Motion, the district court judge explained that he did not know, at the time of trial, that Mr. Martinez was connected to the threats against him. In particular, he asserted that "When that [Agent Acee's] testimony came out and even when I read the [Rule 33 Motion] briefs, I'm like, [Mr. Martinez is] not involved in this." *Id.*, Vol. 4, at 2938 (Tr. of Mot. Hr'g., dated Jun. 3, 2021) (hereinafter the "Rule 33 Motion Hearing"). Stated otherwise, the judge did not "pick . . . up at all" during Agent Acee's testimony that Mr. Martinez was involved in threats against him. *Id.* at 2941. Relatedly, the judge clarified that he "didn't have a chance to look at" the Acee Affidavit, where Mr. Martinez was explicitly mentioned as being involved in threat discussions related to him. *Id.*

66

Additionally, the judge inquired as to why Mr. Martinez failed to move for recusal during the trial. Mr. Martinez asserted that 28 U.S.C. § 455(a)—the statute governing the recusal of federal judges—encompassed two separate requirements: (1) the requirement to consider a motion to recuse made by a party, and (2) a judge's independent obligation to recuse if doing so would be required by § 455(a). And citing the court's "separate obligation to recuse," Mr. Martinez argued that, under the circumstances of his case, "the Court should have recused itself regardless of whether there was a request." *Id.* at 2945.

Contrary to the statements in his motion, in the hearing, Mr. Martinez asserted that the district court judge's independent obligation to recuse sprang from "what was said in the courtroom," as opposed to the affidavit. *Id.* at 2957. In fact, he explicitly disclaimed reliance on the affidavit—stating that "[t]he motion [for a new trial] is *not* about the affidavit." *Id.* (emphasis added). And, with respect to what was said in the courtroom, Mr. Martinez urged the judge not to "look at a single question and a single answer from the cross-examination in a vacuum" but, rather, "look at the cross-examination as a whole." *Id.* at 2958. To that end, he reasoned that "the conversation that was occurring in the courtroom started with threats against the federal prosecutors and FBI agents, and then evolved into questions about . . . a threat against the Court." *Id.*

Once more, the district judge responded that he never connected the vague, passing reference to a threat against *a* judge to Mr. Martinez because Mr. Martinez was "in custody" and "four [other SNM members] [were] picked up [that day]." *Id.*

67

at 2960.  The hearing ended with the district court judge advising that he would "probably" not grant the Rule 33 Motion because "no motion to recuse was made" during trial, despite the parties having "more information" than he did.  *Id.* at 2962.  To better understand precisely what information he had at his disposal, the judge stated he would "go back and try to piece together what information" he had available to him during the trial.  *Id.*  Nevertheless, the judge stressed that Mr. Martinez's connection to the threats "escaped" his attention and that he did not "pick up" that it was Mr. Martinez who was "involved in" the threats.  *Id.*  Finally, the judge noted that he would "look at the portion [of the Rule 33 Motion] that asks for a new sentencing judge."[11]  *Id.* at 2963.

### e.    The District Court's Order Denying the Motion for a New Trial

The district court judge later issued a memorandum opinion and order denying the motion for a new trial.  *See id.*, Vol. 1, at 301–59 (Unsealed Mem. Op. & Order, filed Jul. 12, 2021).  In that order, the judge acknowledged that "the United States Marshals alerted the Court that Robert Padilla[, an SNM associate,] wanted to light up the court," that "[t]he Marshals told the court it was a future threat," and that the court knew that Robert Padilla and other SNM members wanted to kill cooperating witnesses as they came to the courthouse to testify at Mr. Martinez's trial.  *Id.* at

---

[11]    Regarding the sentencing-related recusal challenge, significantly, during the Rule 33 Motion Hearing, Mr. Martinez "agreed that the Court did not have discretion as to Count 1 [i.e., the VICAR count], which has a minimum life sentence. . . . [and] that, although Counts 2 and 4 have discretionary sentences, those sentences" would have no impact on his release date. R., Vol. 1, at 333.

311–12.  The judge explained that he did "not recall [Mr.] Martinez being connected to this threat."  *Id.* at 312.

Moreover, the judge detailed the information he had at his disposal concerning the threats, the court staff involved in reviewing that information, and their assessments of the information.  Specifically, the judge cited six central facts in support of the contention that the judge at no point during the trial knew that Mr. Martinez was connected to the threats against the judge.  First, the judge's courtroom deputy reviewed the warrant affidavit and "did not see that [Mr.] Martinez was connected to the alleged threats."  *Id.* at 320.  Second, the courtroom deputy "showed the Court a few highlighted pages [of the affidavit], which made reference to the Court, but the Court did not read all the capitalized names carefully, and did not make the connection between [Mr.] Martinez and the threat."  *Id.*  Third, the judge explained that he did not "recall anything connecting [Mr.] Martinez to the alleged threats on the Court, and, in any case, . . . did not mentally connect [Mr.] Martinez to the alleged threats on the Court."  *Id.*

Fourth, two of the judge's law clerks cursorily reviewed the affidavit and "[n]either . . . connected [Mr.] Martinez to the threat."  *Id.*  Fifth, during oral argument regarding Mr. Martinez's oral motion for a mistrial, "[t]he Court still did not pick up that [Mr.] Martinez was involved in the threat on the Court."  *Id.* at 321.  Sixth, and finally, the judge reported seeing a news article in the Albuquerque Journal discussing Agent Acee's testimony regarding the threat; however, the judge only "scanned [the article] to see if [his] name was mentioned, saw that [his] name

69

was not in it, did not read every line, and moved on to the courtroom and the continuance of trial"; this "scanning of the article did not alert the Court that [Mr.] Martinez was connected to the alleged threat on the Court." *Id.* at 325. Importantly, the article did not draw the connection between Mr. Martinez and the threat, as it noted only that, "[u]nder cross examination, [Agent] Acee testified that [Mr.] Martinez of Truchas had been linked to two threats to kill FBI agents and prosecutors." *Id.* at 324.

In addition to these six central facts, the judge cited the following as further support for his conclusion that he had failed to connect Mr. Martinez to the threats during trial: the government represented that the arrests Agent Acee made the morning of trial "relate[d] to threats against a witness" and had "nothing to do with [Mr.] Martinez"; the court did not closely "scrutinize" the affidavit, "which discusses . . . [Mr.] Martinez only in a couple paragraphs out of ninety-eight pages" and so, though "the Court understood that the [affidavit] discuss[ed] threats," it "did not make the connection that [Mr.] Martinez was involved in the threat on the Court"; Agent Acee's testimony on cross-examination "did not explicitly link [Mr.] Martinez to threats against the Court"; Mr. Martinez moved for a mistrial because the government's late disclosure allegedly prejudiced him—"not because the Court needed to recuse because of the threat"; and "trial, especially a trial taking place in March 2021 during the pandemic, is a fast-paced environment where the Court does not have the time and the brain power to sift through all the facts that the parties have at their disposal where the parties do not raise the issue." *Id.* at 350–51.

70

Nevertheless, the district court judge acknowledged that, in hindsight, he should have paid closer attention to the details of the evidence and the argument and thus made the connection regarding Mr. Martinez's relationship to the threats. But the judge emphasized that "trying a potentially month-long trial with Covid-19 protocols and . . . the arrests that morning and the oral motion for a mistrial" occupied his attention. *Id.* at 351. And, the judge observed, "if [Mr.] Martinez did not think about [the recusal issue], he can hardly criticize the Court for not raising the issue su[a] sponte." *Id.* Ultimately, the district court judge concluded that because he "was not consciously aware of [Mr.] Martinez'[s] connection to the threat, . . . [he] could not evaluate whether [he] needed to recuse under § 455" and our precedent. *Id.*

Though the district court judge cited his lack of actual knowledge of Mr. Martinez's connection to the threats as his chief reason for denying the Rule 33 Motion, he offered two additional bases for the denial. First, the judge reasoned that the threat was not as serious as those discussed in Tenth Circuit precedent, notably in our decision in *United States v. Greenspan*, 26 F.3d 1001 (10th Cir. 1994), because the alleged plotters here had been arrested. Second, the judge noted that, unlike *Greenspan*, "the Court has not taken, nor is there is [sic] a suggestion that the Court has taken, any action either to expedite trial proceedings to mitigate the threat that [Mr.] Martinez poses or rule[d] against Martinez because of the alleged threat . . . ." R., Vol. 1, at 354.

71

The district court judge also denied Mr. Martinez's request for him to recuse from the sentencing. As the basis for this refusal to recuse, the judge cited, once more, the reduced severity of the threat and the fact that Mr. Martinez did "not allege that the Court [took] any action against him because of the threat." *Id.* at 356. Notably, however, the judge offered a third reason justifying its continuing involvement in Mr. Martinez's sentencing: owing to the mandatory life sentence attached to Mr. Martinez's VICAR conviction, an objective, reasonable person would not question his impartiality in imposing sentence on Mr. Martinez because the mandatory sentence deprived him of sentencing discretion.

### 2.    Legal Framework

Rule 33 of the Federal Rules of Criminal Procedure authorizes district courts to grant new trials if "require[d]" in "the interest of justice." FED. R. CRIM. P. 33(a). A new trial may be an appropriate remedy if the judge's impartiality during the trial could have reasonably been questioned. *See United States v. Nickl*, 427 F.3d 1286, 1297–98 (10th Cir. 2005).

Specifically, federal law instructs that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). "This [recusal] requirement is intended 'to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible.'" *United States v. Wells*, 873 F.3d 1241, 1251 (10th Cir. 2017) (quoting *Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1310 (10th Cir. 2015)). "The standard is purely objective. The inquiry is limited to outward manifestations and reasonable

72

inferences drawn therefrom." *United States v. Cooley*, 1 F.3d 985, 993 (10th Cir. 1993); *see id.* ("In applying § 455(a), the judge's actual state of mind, purity of heart, incorruptibility, or lack of partiality are not the issue."); *see also* Charles Gardner Geyh & Kris Markarian, JUDICIAL DISQUALIFICATION: AN ANALYSIS OF FEDERAL LAW, § II.B.1.A, at 20 (3d ed. 2020) ("Section 455(a) makes clear that judges should apply an objective standard in determining whether to disqualify.").  "In other words, a judge's subjective state of mind is irrelevant; what matters is whether 'the public might reasonably believe that [the judge] *knew*' of 'facts creating an appearance of impropriety.'"  *Wells*, 873 F.3d at 1251 (alteration in original) (emphasis added) (quoting *Liljeberg v. Health Serv. Acquisition Corp.*, 486 U.S. 847, 860 (1988)).

"In applying the [objective] test, the initial inquiry is whether a reasonable *factual* basis exists for calling the judge's impartiality into question."  *Cooley*, 1 F.3d at 993; *see United States v. Pearson*, 203 F.3d 1243, 1277 (10th Cir. 2000) (noting that we examine whether "sufficient factual grounds exist to cause a reasonable, objective person, knowing all the relevant facts, to question the judge's impartiality"); *see also Cheney v. U.S. Dist. Ct. for the Dist. of Columbia*, 541 U.S. 913, 914 (2004) (mem.) (Scalia, J.) ("The decision whether a judge's impartiality can 'reasonably be questioned' is to be made in light of the facts as they existed, and not as they were surmised or reported.") (quoting *Microsoft Corp. v. United States*, 530 U.S. 1301, 1302 (2000) (mem.) (Rehnquist, C.J.)).

"We have stressed that 'section 455(a) must not be so broadly construed that it becomes, in effect, presumptive, so that recusal is mandated upon the merest

73

unsubstantiated suggestion of personal bias or prejudice.'" *Cooley*, 1 F.3d at 993 (quoting *Franks v. Nimmo*, 796 F.2d 1230, 1234 (10th Cir. 1986)).  Indeed, it should not be forgotten that "[t]here is as much obligation for a judge not to recuse when there is no occasion for him to do so as there is for him to do so when there is." *Hinman v. Rogers*, 831 F.2d 937, 939 (10th Cir. 1987); *accord Nichols v. Alley*, 71 F.3d 347, 351 (10th Cir. 1995) ("[W]e are mindful that a judge has as strong a duty to sit when there is no legitimate reason to recuse as he does to recuse when the law and facts require."); *see also* Geyh & Markarian, *supra*, § II.A.2.b, at 16 (quoting *Hinman* and noting that "most circuits" have adopted this "duty to sit" principle).

"In conducting this review, we must ask how these facts would appear to a *well-informed*, thoughtful and objective observer," who is "an average member of the public," not a "hypersensitive, cynical, and suspicious person." *Mathis*, 787 F.3d at 1310 (emphasis added) (quoting *Sensley v. Albritton*, 385 F.3d 591, 599 (5th Cir. 2004)).  And courts must take into account that "cases within § 455(a) are extremely fact driven 'and must be judged on [their] unique facts and circumstances more than by comparison to situations considered in prior jurisprudence.'" *Nichols*, 71 F.3d at 351 (alteration in original) (quoting *United States v. Jordan*, 49 F.3d 152, 157 (5th Cir. 1995)); *accord Wells*, 873 F.3d at 1251.

Notably, "recusal is required even when a judge lacks actual knowledge of the facts indicating his interest or bias in the case if a reasonable person, knowing all the circumstances would expect that the judge would have actual knowledge." *Wells*, 873 F.3d at 1251 (10th Cir. 2017) (quoting *Liljeberg*, 486 U.S. at 860–61); *see E. &*

74

*J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1295 n.7 (9th Cir. 1992) (noting that the judge's "lack of actual knowledge is irrelevant if . . . a person knowing all of the facts could reasonably question [the judge's] impartiality"); Geyh & Markarian, *supra*, § II.B.1.a at 22 ("Section 455 also requires disqualification if a reasonable person might believe that the judge was aware of circumstances creating an appearance of partiality, even if the judge was in fact unaware.").

To be sure, the statute does not contemplate that judges will, sua sponte, "perform the impossible—to disqualify themselves based on facts they do not know." *Liljeberg*, 486 U.S. at 861; *see id.* ("[A] judge could never be expected to disqualify himself based on some fact he does not know, even though the fact is one that perhaps he should know or one that people might reasonably suspect that he does know."). Nevertheless, "a judge has a continuing duty to recuse before, during, or, in some circumstances, after a proceeding, if the judge concludes that sufficient factual grounds exist to cause an objective observer reasonably to question the judge's impartiality." *Cooley*, 1 F.3d at 992. Thus, even if the judge lacked actual knowledge of facts necessitating recusal during the proceeding, "the judge is not called upon to perform an impossible feat" when "called upon to rectify an oversight and to take the steps necessary to maintain public confidence in the impartiality of the judiciary," *Liljeberg*, 486 U.S. at 861, upon determining that "a reasonable person, knowing all the circumstances would expect that the judge would have actual knowledge" of those facts, *Wells*, 873 F.3d at 1251 (quoting *Liljeberg*, 486 U.S. at 861).

One such step to maintain the confidence of the public could be granting a motion for new trial, when the judge determines the judge's participation in the trial effected a violation—even an unknowing one—of the recusal statute. *See Nickl*, 427 F.3d at 1297–98; *cf. Liljeberg*, 486 U.S. at 861 (noting that "[t]he initial appeal was taken from his failure to disqualify himself and vacate the judgment *after* he became aware of the appearance of impropriety, not from his failure to disqualify himself when he first became involved in the litigation and lacked the requisite knowledge").

We have held that "threats or attempts to intimidate a judge will not ordinarily satisfy the requirements for disqualification under section 455(a)." *Greenspan*, 26 F.3d at 1006; *accord Cooley*, 1. F3d at 993–94. This includes death threats, especially when there is reason to believe that they are strategically made to force recusal. *See, e.g.*, Geyh & Markarian, *supra*, II.B.1.b.iv, at 48–49 ("Parties and their lawyers sometimes behave in ways that predictably engender a judge's animus, but such behavior does not trigger the need for disqualification. To hold otherwise would be to create an opportunity for parties to exhibit hostile behavior strategically, as a means to force disqualification. . . . The courts have taken a similar approach to threats against the judge.").

### 3.    Analysis

Mr. Martinez argues that the district judge abused his discretion in denying Mr. Martinez's Rule 33 Motion, reasoning that a reasonable person—aware of all the facts—would have questioned whether the judge could have impartially presided over his trial and sentencing in light of the "serious and credible" threats against the

76

judge—threats that were undoubtedly "not designed to judge shop or achieve recusal of the trial judge." Aplt.'s Opening Br. at 44; *see also* Aplt.'s Reply Br. at 14 ("The focus is instead on whether the threat was real (the record established that it was), and whether the threat was made to secure a trial benefit (there is no record evidence that it was)."). Labeling as "suspect" the judge's assertions that he lacked actual knowledge of any connection between Mr. Martinez and the threats against him, Mr. Martinez stresses that "the test is not whether the court knew of the threat, but rather whether a reasonable, objective person would call into question, based upon all of the facts, the impartiality of the court in presiding over the proceeding." Aplt.'s Opening Br. at 45–46; Aplt.'s Reply Br. at 13 ("The § 455 recusal analysis, however, does not look at Judge Browning's actual knowledge. It looks only to whether a reasonable, objective person would question Judge Browning's impartiality.").

Moreover, in a similar vein, Mr. Martinez suggests that the judge's subjective assessment of the severity of the threats against him is immaterial. *See* Aplt.'s Opening Br. at 44 n.2 (noting that the district court's conclusion that "no reasonable person could question its impartiality because the threats against it [i.e., the district judge] were not as serious as the threats against the court in *Greenspan*" was "improper because it [was] based upon the court's subjective understanding of the threats against" it); Aplt.'s Reply Br. at 14 ("Whether a reasonable observer would objectively believe that Judge Browning subjectively believed that he was being legitimately threatened is immaterial.").

77

In sum, Mr. Martinez concludes that "[i]t was an abuse of discretion to deny [his] motion for a new trial because the threats objectively call into question the propriety of Mr. Martinez's trial and sentence." Aplt.'s Opening Br. at 46. Though we agree in part with the analytical premises of Mr. Martinez's arguments, we do not agree with his conclusions. Accordingly, we uphold the district court's decision denying the Rule 33 Motion.

### a. Whether the Judge Should Have Recused from the Trial

### i. Analytical Scope

We begin by defining the analytical scope for our analysis. Given the Supreme Court's clear language in *Liljeberg*, 486 U.S. at 861, and our own precedent in *Wells*, 873 F.3d at 1251, we agree with Mr. Martinez, insofar as he contends that the focus of the § 455(a) recusal analysis is not properly on whether the presiding district judge actually knew facts that would necessitate his recusal. Rather, the focus of the analysis is on whether "a reasonable person, knowing all the circumstances would *expect* that the judge would have actual knowledge" of the facts that would necessitate his recusal, *Wells*, 873 F.3d at 1251 (emphasis added) (quoting *Liljeberg*, 486 U.S. at 860–61)— *viz.*, whether a reasonable person would expect the judge to have actual knowledge of facts that would have caused a reasonable person to question whether the judge could impartially preside over the proceedings, *see* Geyh & Markarian, *supra*, § II.B.1.a, at 22 ("Section 455 also requires disqualification if a reasonable person might believe that the judge was aware of

78

circumstances creating an appearance of partiality, even if the judge was in fact unaware.").

To the extent that the district court judge here believed that the focus of § 455(a)'s recusal analysis was on what he actually knew about the threats, he was mistaken. *See* R., Vol. 1, at 301 (opining in denying the motion for new trial that one reason for that action was because "the Court was not aware of the connection between [Mr.] Martinez and the threat until after trial"). Yet it does not ineluctably or even naturally follow, as a matter of logic, that evidence of a judge's actual knowledge is irrelevant. Such evidence, as here, may shed significant light on—and even answer—the proper question of what a reasonable observer would *expect* the judge to know. And because it is "axiomatic" that we may affirm on any basis that finds support in the record, *United States v. Garcia*, 946 F.3d 1191, 1207 (10th Cir. 2020), notwithstanding the district judge's mistaken analytical focus here, we ultimately uphold his decision denying the motion for new trial, after undertaking an inquiry that views the matter through the proper analytical lens.

Before undertaking that inquiry into what a reasonable observer—fully apprised of the relevant facts—would have expected the judge to know about Mr. Martinez's connection to SNM's threats against him, it is important to recall that "threats or other attempts to intimidate the judge" under our precedent "will not ordinarily satisfy the requirements for disqualification under § 455(a)." *Cooley*, 1 F.3d at 993–94. More specifically, not "all death threats against a judge will mandate

that judge's recusal under Section 455." *Greenspan*, 26 F.3d at 1006. We elaborated on this point in *Greenspan*:

> [I]f a death threat is communicated directly to the judge by a defendant, it may normally be presumed that one of the defendant's motivations is to obtain a recusal, particularly if he thereafter affirmatively seeks a recusal. As we have stated earlier, if a judge concludes that recusal is at least one of the defendant's objectives (whether or not the threat is taken seriously), then section 455 will not mandate recusal because that statute is not intended to be used as a forum shopping statute. Here, by contrast, the defendant did not communicate the death threat to the judge, nor is there any suggestion that the defendant ever intended the judge to learn of the threat before it was actually carried out. Thus, there is nothing here to suggest that the defendant was using the threat as a device to force a recusal.

*Id.*; *see* Geyh & Markarian, *supra*, II.B.1.b.iv, at 48–51.

We agree with Mr. Martinez, however, insofar as he contends that the recusal analysis does not turn on a particular district judge's subjective assessment of the seriousness of the threats but, rather, on whether a reasonable observer would perceive the threats as serious and, moreover, to be of the kind that would cause a reasonable observer to question the impartiality of a judge who would be expected to be aware of them—for instance, the kind of threats that are in fact intended to be carried out and not interposed for forum-shopping purposes. *See Greenspan*, 26 F.3d at 1006 ("Even if this judge were one of those remarkable individuals who could ignore the personal implications of such a [death] threat, the public reasonably could doubt his ability to do so.").

The district judge here, on the one hand, appeared to properly focus—in assessing his duty to recuse—on the objective facts of this case. And, notably, he

drew distinctions between the facts of this case and those in *Greenspan*. *See* R., Vol. 1, at 350 (in comparing the facts in this case to those in *Greenspan*, concluding that "the threat is not as serious as the one in *Greenspan*, which involved a multi-state conspiracy to hire a hitman to kill the judge and his family"); *id.* at 352 ("[T]he alleged threat do[es] not rise to the level of seriousness in *Greenspan*.").

On the other hand, the district judge appears to have mistakenly framed the analysis in terms of his "perspective" of the seriousness of the threat, rather than the perspective or viewpoint of the reasonable observer, with knowledge of the relevant facts. *Id.* at 352–53 (stating that "from the Court's perspective, there effectively was no threat at the time that [Mr.] Martinez says the Court should have perceived the threat, because all the men involved in the threat were and are in custody"); *see id.* at 353 ("[W]hile the Court mistakenly thought, at the time, that the four arrests on Wednesday morning were related to the threat on the Court, with [Agent] Acee's testimony, the Court thought that all men related to the threat on the Court [were] now in custody. So, on that Wednesday morning, the Court thought that the threat was gone. Thus the seriousness of the threat was, in the Court's mind, reduced to zero at the precise moment that, [Mr.] Martinez contends, the Court learned of [Mr.] Martinez' ties to the alleged threat on the Court—the morning of the first day of testimony."). This analytical framing error, however, is of no moment because we ultimately conclude below that the reasonable observer would not have expected the district judge to know of Mr. Martinez's connection to SNM's threats against him in the first place. Therefore, there would have been no occasion for the district judge to

81

assess the seriousness of the threats.  In any event, we may affirm on any ground supported by the record.  *See, e.g.*, *Garcia*, 946 F.3d at 1207.

In laying the foundation for our analysis, we also must address a preservation issue that impacts the factual universe that a reasonable observer would have considered in setting expectations regarding what the district court judge should have known concerning Mr. Martinez's connection to SNM's threats against him.  Critically, during the hearing on the Rule 33 Motion, Mr. Martinez expressly disclaimed reliance on the contents of Agent Acee's affidavit to support his request for recusal.

The context of this disclaimer is important.  It came immediately after a dialogue between the district court judge and the prosecutor, in which the judge questioned whether he "ever read the affidavit" or "got a copy," and the prosecutor indicated that the affidavit was "recent," and the prosecutor was "fairly certain" that the judge "did not get a copy" and the prosecutor was "not sure" that the judge "had access to it."  R., Vol. 4, at 2956–57.  At this point, Mr. Martinez agreed with the prosecutor's statements, but stressed that the judge's apparent lack of access to the affidavit did not undercut his recusal claim because it was not based on the affidavit: "Your Honor, but that's not what this motion is about.  The motion is not about the affidavit.  The motion is about what was said in the courtroom."  *Id.* at 2957.

Yet despite this disclaimer, Mr. Martinez on appeal seeks to rely on the affidavit's averments to support his recusal claim.  In this regard, Mr. Martinez argues that the district court became "apprised of threats against it by Mr. Martinez

82

and other SNM members . . . . through the testimony of an FBI agent and a *search warrant affidavit*." Aplt.'s Opening Br. at 28 (emphasis added); *see also id.* at 45 (arguing that the threat was relayed to the district court by "an affidavit").[12]

Insofar as Mr. Martinez now asserts that the contents of Agent Acee's affidavit should have alerted the judge to his connection to SNM threats against the judge and, by extension, put the judge on notice that his impartiality might reasonably be questioned, we deem that argument to be waived under our waiver-by-abandonment doctrine. *See United States v. Egli*, 13 F.4th 1139, 1144 (10th Cir. 2021) (explaining that waiver-by-abandonment "occurs when a party deliberately considers an issue and makes an intentional decision to forgo it" (quoting *United States v. Malone*, 937 F.3d 1325, 1327 (10th Cir. 2019))). During the hearing on the Rule 33 Motion, Mr. Martinez unequivocally stated that his "motion [was] not about the affidavit," R., Vol. 4, at 2957, after the parties agreed that the district judge almost certainly would not have had access to the affidavit. In our view, Mr. Martinez "deliberately

---

[12]    Setting the stage for this argument, in the "Issues Presented" section of his appellate brief, Mr. Martinez asks:

> Whether Mr. Martinez is entitled to a new trial because the district court failed to recuse itself after witness testimony, a *written search warrant affidavit*, and significant argument was presented during trial regarding Mr. Martinez's, alongside other Sindicato de Nuevo Mexico members, alleged threat to kill the presiding judge and to "light up the courtroom" during trial.

Aplt.'s Opening Br. at 2 (emphasis added).

83

consider[ed]" the affidavit's role in his recusal claim and "ma[de] an intentional decision to" to shift the judge's focus elsewhere—which Mr. Martinez seemingly reasoned would maintain the vitality of his recusal claim, despite the judge's lack of access to the affidavit. *Malone*, 937 F.3d at 1327; *cf. United States v. Cruz-Rodriguez*, 570 F.3d 1179, 1185 (10th Cir. 2009) ("[I]t is patent that, viewed as a whole, [the defendant's] intentional litigation conduct . . . effected a waiver of any challenge that [the defendant] may have had . . . .  Indeed, this is tantamount to the classic waiver situation where a party 'actually identified the issue,' 'deliberately considered' it, and then affirmatively acted in a manner that 'abandoned any claim' on the issue." (quoting *United States v. Zubia-Torres*, 550 F.3d 1202, 1205–06 (10th Cir. 2008))).

Indeed, Mr. Martinez's unequivocal "disavow[al]" of the affidavit during the motion hearing is a fact that is not lost on the government here on appeal; the government states that "it is not clear how [Mr.] Martinez wants [us] to treat the affidavit." Aplee.'s Resp. Br. at 50.  To be sure, the government does not expressly urge us to disregard on waiver grounds Mr. Martinez's reliance on the affidavit's averments.  However, we "are not obliged to apply forfeiture principles to the government's briefing omission" in failing to expressly urge us to find waiver. *United States v. McGehee*, 672 F.3d 860, 873 n.5 (10th Cir. 2012).  And, in light of Mr. Martinez's clear and unequivocal statements, we are not inclined to apply those forfeiture principles to the government's briefing here.

Moreover, though the district court judge acknowledged reviewing certain highlighted pages of the affidavit that his staff provided to him, the court framed Mr. Martinez's recusal claim as relating to Agent Acee's testimony. *See* R., Vol. 1, at 301 (stating that one of the "primary issues" in the motion for new trial was whether "Special Agent Brian Acee's testimony on the first day of the evidentiary portion of the trial about an alleged threat . . . made against . . . the Court raises reasonable questions about the Court's impartiality"); *id.* at 346 (noting that one of the "two arguments" of Mr. Martinez concerned whether "the Court should have recused itself . . . when . . . [Agent] Acee testified that [Mr.] Martinez allegedly was connected to a threat against the Court"). Like the district court judge, that in-court testimony of Agent Acee also will be our focus here.[13]

---

[13] In any event, a reasonable observer—fully aware of the facts—would be very unlikely to expect the district court judge here to be aware during the trial of the averments of Agent Acee's affidavit—as they related to Mr. Martinez's connection to SNM's threats against the judge. Recall that the parties agreed during the hearing that it was virtually certain that the district court judge did not have access to the whole affidavit on the day Agent Acee testified. And the district court judge recalled, at most, seeing certain highlighted pages from the affidavit that his staff provided to him. But neither the judge nor his staff—including his two law clerks who "briefly saw" the affidavit—concluded, based on their cursory reviews of the affidavit, that Mr. Martinez was connected to SNM's threats against the judge. R., Vol. 1, at 320. As the court noted, the affidavit mentioned Mr. Martinez "only in a couple [of] paragraphs out of the ninety-eight pages." *Id.* at 350. A reasonable observer would have been aware of these circumstances, in addition to understanding the fast-moving trial environment in which the district court judge learned of the Acee Affidavit and the fact that it contained information regarding SNM's threats. *Cf. id.* at 351 (distinguishing *Greenspan* from the circumstances he faced, the district court judge noted, among other things, that "trial, especially a trial taking place in March 2021 during the pandemic, is a fast-paced environment where the Court does not have the time and the brain power to sift through all the facts that the parties have at their disposal where the parties do not raise the issue"). In our view, it is very

85

In sum, we exercise our discretion to deem this affidavit dimension of Mr. Martinez's recusal claim waived, and consider the merits of that claim in the light of the testimony that the district court judge heard in the courtroom. And we conclude that a reasonable observer would not have expected the district court judge to know from this testimony about Mr. Martinez's connection to SNM's threats against him. Consequently, a reasonable observer would have had no reason to question the district court judge's impartiality in presiding over the trial.

### ii.    Application

A reasonable observer's conclusion that the district court judge would not have been expected to know of Mr. Martinez's connection to SNM threats against him is understandable considering the scattershot, imprecise testimony regarding the threats and Mr. Martinez's own failure to raise the recusal issue.[14]  Consider the

---

unlikely that a reasonable observer would have expected the district court judge to be aware of the contents of the Acee affidavit during the trial. Nevertheless, it is sufficient for resolving this appeal to conclude that Mr. Martinez has waived an argument to the contrary, and we do not definitively opine on the matter.

[14]    Indeed, Mr. Martinez apparently failed to make the connection himself because he predicated his motion for a mistrial on the government's "failure to disclose the information that Agent Acee testified to and was elicited on cross about the [arrests of SNM members] that happened this morning," R., Vol. 4, at 859—not on recusal considerations. Akin to the district judge, we might fairly ask: if Mr. Martinez failed to discern any recusal implications in Agent Acee's testimony, why should a reasonable observer have expected the district court judge to do so? *See id.*, Vol. 1, at 351 ("The Court is not criticizing [Mr.] Martinez for no[t] raising the recusal issue, but if [Mr.] Martinez did not think about it, he can hardly criticize the Court for not raising the issue sue sponte."). As the government points out, Agent Acee's testimony did not explicitly link Mr. Martinez to threats against the district court judge.

circumstances surrounding the testimony.  The issue of SNM's threats initially arose in the context of witness intimidation after Agent Acee testified that he had arrested several SNM members the morning of trial.  That testimony prompted a sidebar during which the prosecutor advised that the arrests "relate[d] to this case, but *not* directly to the defendant" and pertained to "threats against a witness."  R., Vol. 4, at 810 (emphasis added).  Mr. Martinez then requested discovery related to the arrests, and the prosecutor supplied him with a copy of the sealed warrant affidavit, which detailed SNM's efforts to intimidate witnesses, and their threats against agents, prosecutors, and, finally, the presiding district judge.  Agent Acee, however, neither read the ninety-eight-page affidavit aloud in court nor testified about threats against the presiding district judge on direct examination.  And the prosecutor refrained from soliciting information related to the affidavit on direct examination.

Rather, on cross-examination, Mr. Martinez asked Agent Acee if he "recall[ed]" mentioning "a plot to kill FBI agents and prosecutors" on "direct."  *Id.* at 834.  Agent Acee responded that he was "intimately familiar with those threats" and then affirmed—in response to further questioning—that Mr. Martinez was "involved with a plot to assassinate FBI agents and federal prosecutors."  *Id.* at 834–35.  Mr. Martinez then turned his cross-examination to a different topic relating to cooperating witnesses.  Eventually, Mr. Martinez inquired: "[S]o I just wanted to go and . . . close off the threats against FBI agents and prosecutors, just for completeness.  I think there was a judge's name . . . floated on one of those; is that correct?"  *Id.* at 842.  "Yes," Agent Acee confirmed, before testifying that he

87

"arrested four people th[at] morning" on "charges arising from the threats against FBI agents, prosecutors." *Id.*

As the transcript of his testimony reveals, Agent Acee connected Mr. Martinez to threats against "FBI agents and prosecutors"—not judges. *Id.* at 834. And, more specifically, when Agent Acee did testify about a threat against an unnamed judge, he did not connect that threat to Mr. Martinez. Thus, in our view, a reasonable observer would not have been inclined to expect the district court judge—based on this testimony—to connect Mr. Martinez to SNM's threats against him.[15]

This conclusion eviscerates Mr. Martinez's argument, insofar as it is based on *Greenspan*. That is because whereas a reasonable observer would not have expected the district court judge here to have any knowledge of Mr. Martinez's connection to SNM's threats against him based on Agent Acee's testimony, the district court judge in *Greenspan* undisputedly possessed actual knowledge of the defendant's death threats against him and his family and, even more, acted to mitigate the risk that the

---

[15]    That the district court judge—in retrospect, after considering the motion for new trial and the arguments of counsel in a hearing on that motion, and after "looking back" at the trial testimony of Agent Acee and events of that trial day— subjectively believed that he could have "parse[d] the testimony and realize that, read in context, [Agent] Acee's testimony indicates that [Mr.] Martinez was part of the discussions to threaten [him]," R., Vol. 1, at 351 n.19, has no material impact on our conclusion. The judge was unequivocal in observing that "[Agent] Acee did not explicitly state that [Mr.] Martinez was involved in the threat against [the district judge]." *Id.* More importantly, the focus of the inquiry is what a reasonable observer would have expected the judge to know during the period that he was presiding over the trial. His subjective belief about what he personally was able to discern *after the trial*—once the recusal issue was presented to him and Mr. Martinez had the opportunity to offer argument about it—is simply not germane to the analysis.

threats would materialize.  Specifically, recall that in *Greenspan*, "[t]he trial court was aware" at the time of Mr. Greenspan's sentencing hearing of allegations that Mr. Greenspan had conspired to kill the district judge or members of his family.  26 F.3d at 1005.  Owing to that awareness, the district judge "expedited the [sentencing] hearing in order to get [Mr. Greenspan] into the federal penitentiary system, where he c[ould] be monitored more closely" and "refused to continue the sentencing hearing at the request of defendant's counsel, who had been appointed only two days before the expedited sentencing date." *Id.* (internal quotations omitted).  We concluded that under the "unique circumstances" of the judge having "learned of an alleged conspiracy [involving Mr. Greenspan] to assassinate him from the FBI," the "trial judge should have recused himself from sentencing [Mr.] Greenspan."[16] *Id.* at 1006.

---

[16] The district judge here said that he did not "read *Greenspan* to mandate recusal anytime there is a serious threat" and that the case "emphasizes repeatedly" the trial court's action in the face of the death threat to accelerate the sentencing proceedings of the defendant—making that decision effectively a "plus" factor necessitating the recusal. R., Vol. 1, at 354; *see id.* at 347 (noting that "the Court does not read *Greenspan* to create a per se rule that a judge must recuse when it becomes aware of a legitimate threat").  This interpretation of *Greenspan* led the judge to identify as a discrete factor cutting against Mr. Martinez's argument for recusal the fact that he had not "taken any action based on the threat that raises questions about the Court's impartiality." *Id.* at 353–54; *see* 354 ("Here, the Court has not taken, nor is there is a suggestion that the Court has taken, any action either to expedite trial proceedings to mitigate the threat that [Mr.] Martinez poses or rule[d] against [Mr.] Martinez because of the alleged threat, and, under *Greenspan*, the mere specter of a serious threat, without more, is not sufficient reason for a court to recuse.").

It is quite true that *Greenspan* does not *require* a judge to recuse in each and every instance that a serious threat—including a death threat—is lodged against him. Indeed, *Greenspan* says as much: "[I]f a judge concludes that recusal is at least one of the defendant's objectives (*whether or not the threat is taken seriously*), then

Viewed through the eyes of the reasonable observer, the circumstances here could not be further away from this.

In sum, we conclude that a reasonable observer would not have expected the district court judge to know from the events of trial—specifically, Agent Acee's testimony—about Mr. Martinez's connection to SNM's threats against him. Consequently, a reasonable observer would have had no reason to question the district court judge's impartiality in presiding over Mr. Martinez's trial. On this basis, we conclude that the district judge did not abuse his discretion in rejecting Mr.

---

section 455 will not mandate recusal because that statute is not intended to be used as a forum shopping statute." 26 F.3d at 1006. However, we respectfully disagree with the district judge's view that, under *Greenspan*, a serious threat against a judge, without more, cannot be sufficient to warrant recusal under § 455. Indeed, *Greenspan*'s language itself suggests to the contrary; it speaks of the necessity for the judge to recuse, before even mentioning the court's decision to mitigate the risk of the defendant's threats through accelerating his sentencing proceeding. *See* 26 F.3d at 1006 ("The court concludes that under these unique circumstances, the trial judge should have recused himself from sentencing [Mr.] Greenspan. The judge learned of the alleged threat from the FBI, and there is nothing in the record to suggest the threat was a ruse by the defendant in an effort to obtain a different judge. . . . In a case like the present, where there is no inference that the threat was some kind of ploy, the judge should have recused himself pursuant to section 455(a) and allowed another judge to sentence [Mr.] Greenspan."). Moreover, we expressly noted in *Greenspan* that there were "unique circumstances" at play there. *Id.* This strongly suggests that it would be ill-advised to infer from that case—as the district judge appeared to do here—a universally applicable "plus" factor that must exist beyond a serious threat in order to justify recusal. R., Vol. 1, at 354. Moreover, any decisional approach that seeks to identify and apply universally applicable factors in the recusal analysis would be in tension with our precedent that counsels that "cases within § 455(a) are extremely fact driven 'and must be judged on [their] unique facts and circumstances more than by comparison to situations considered in prior jurisprudence.'" *Nichols*, 71 F.3d at 351 (alteration in original) (quoting *Jordan*, 49 F.3d at 157); *accord Wells*, 873 F.3d at 1251.

Martinez's recusal claim to the extent that it pertains to his work in presiding over the trial.

### b. Whether the District Court Judge Should Have Recused from the Sentencing

Finally, in support of his recusal claim as it relates to his sentencing proceeding, Mr. Martinez offers nothing more than bald, conclusory assertions, which only are made in tandem with his recusal arguments regarding the trial. In other words, he offers no discrete recusal arguments relating to his sentencing. Specifically, Mr. Martinez maintains that "there is little doubt that a reasonable person would conclude that [the threats discussed in Agent Acee's testimony and affidavit] were of such a serious nature as to call into question the propriety of his trial and sentence." Aplt.'s Opening Br. at 45. And to conclude his argument, he asserts the following: "The court[']s subjective understanding of those threats is irrelevant. It was an abuse of discretion to deny Mr. Martinez's motion for a new trial because the threats objectively call into question the propriety of Mr. Martinez's trial and sentence." *Id.* at 46; *see also id.* at 29 (asserting conclusorily in his "Summary of Argument" section that SNM's threats involving Mr. Martinez were "serious" and "result[ed] in a reasonable, objective person legitimately questioning the impartiality and propriety of Mr. Martinez's trial and subsequent sentence").

The government is correct in asserting that, though Mr. Martinez nominally raises "the potential recusal from his sentencing," he has failed to develop a meaningful argument regarding that issue. Aplee.'s Resp. Br. at 46 n.9. This lack of

91

a meaningful argument in itself might justify us in deeming Mr. Martinez's sentencing-related recusal claim waived. *See, e.g.*, *United States v. Pursley*, 577 F.3d 1204, 1232 n.17 (10th Cir. 2009) ("Under our precedent, this skeletal reference is insufficient to raise the ex parte/disclosure concern as a discrete appellate issue. Accordingly, we appropriately deem it to be waived." (citation omitted)); *Bronson*, 500 F.3d at 1105 (observing that "cursory statements, without supporting analysis and case law" are not the kind of briefing that preserves arguments for review). But there is more.

Unlike Mr. Martinez's briefing, the district court judge separately addressed the question of recusal relating to Mr. Martinez's sentencing proceeding and offered discrete reasons why he deemed there to be no need for recusal. Though Mr. Martinez does quarrel generally with one of them—i.e., the district judge's allegedly subjective understanding of the severity (or lack thereof) of the threats against him—Mr. Martinez notably fails to address another key reason why the district judge rejected his recusal claim regarding sentencing.[17] Specifically, the district judge reasoned that owing to the mandatory life sentence attached to Mr. Martinez's VICAR conviction (i.e., Count 1), an objective, reasonable observer would not question his impartiality in imposing sentence on Mr. Martinez because the

---

[17]    Recall that in justifying its decision not to recuse, the district court also explained that Mr. Martinez's "alleged threat against the Court [was] not as serious as in *Greenspan*" and Mr. Martinez had "not allege[d] that the Court . . . t[ook] any action against him because of the threat." R., Vol. 1, at 356.

mandatory sentence deprived him of sentencing discretion.[18]  Mr. Martinez's failure to address this lack-of-discretion rationale of the court dooms his recusal claim as to his sentencing.

Our law is clear: "The first task of an appellant is to explain to us why the district court's decision was wrong." *Nixon v. City & Cnty. of Denver*, 784 F.3d 1364, 1366 (10th Cir. 2015).  Mr. Martinez has failed in this task.  In particular, he has waived any argument challenging the district court judge's lack-of-discretion rationale.  And, absent such a challenge, we may uphold the district court judge's ultimate decision not to recuse from Mr. Martinez's sentencing without reaching the merits.  *See, e.g.*, *Rivero v. Bd. of Regents of Univ. of New Mexico*, 950 F.3d 754, 763 (10th Cir. 2020) ("[R]ather than address the merits, we choose to affirm the district court's rejection of [the plaintiff's] motion to recuse on the ground that his opening brief on appeal never challenges the rejection of the motion on the ground of untimeliness. . . .  If the district court states multiple alternative grounds for its ruling and the appellant does not challenge all those grounds in the opening brief, then we may affirm the ruling.").

## IV.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment as to Mr. Martinez's convictions and sentence.

---

[18]     Notably, during the district court's hearing on the Rule 33 Motion, Mr. Martinez "agreed that, although Counts 2 and 4 have discretionary sentences, those sentences will not 'change the outcome of whether he's released.'"  R., Vol. 1, at 333.

93